ANNA E. ROBISON and EARL ROBISON, Administrators of the Estate of D. M. ROBISON, v. CHICAGO AND EASTERN ILLINOIS RAILWAY COMPANY, a Corporation, Appellant.—64 S. W. (2d) 660.

Division One, November 10, 1933.*

*NOTE: Opinion filed at May Term, 1933, August 24, 1933; motion for rehearing filed; motion overruled at September Term, November 10, 1933.

*Jones, Hocker, Sullivan & Gladney* and *Vincent L. Boisaubin* for appellant.

*Eagleton, Henwood & Waechter* and *Frank P. Aschemeyer* for respondents.

84

ATWOOD, J.—This is an appeal from a judgment for $20,000 obtained by the administrators of the estate of D. M. Robison, deceased, against the Chicago and Eastern Illinois Railway Company on account of the death of Mr. Robison who, along with the fireman and head brakeman, was killed in an explosion of the boiler of one of said railway company's freight locomotives then in his charge.

The action was brought under the Federal Employers' Liability and Boiler Inspection Acts. It was alleged in the petition that the "explosion occurred as a direct and proximate result of the failure on the part of the defendant. its agents and officers, to comply with the terms and provisions of the laws of the United States, known as the Federal Boiler Inspection Act as enacted February 17, 1911, and as amended;" it being further alleged that "said boiler of said locomotive and appurtenances thereof were not in proper condition or sufficient to operate in the service which they were being used as aforesaid, and defendant failed to inspect the aforesaid boiler from time to time as required by the provisions of the above act."

Defendant's answer admitted the employment of plaintiffs' decedent as alleged in the petition and admitted that he sustained injuries by the explosion of the boiler of an engine resulting in his death, but denied each and every other allegation, statement and averment therein contained. The answer further alleged that "the death of the said D. M. Robison was due solely to his own act in permitting the water in the engine of which he had charge to get too low and in failing and neglecting to keep sufficient water in the boiler of said engine; which acts of said deceased directly caused his death."

Plaintiff's reply was a general denial.

Defendant offered a demurrer to the evidence at the close of plain-

tiffs' case and at the close of the whole case, which demurrers were refused. Appellant's principal contention is that plaintiffs made no case for the jury and that these demurrers should have been sustained.

Mr. Robison was about sixty-two years of age at the time of his death and had been employed by appellant as a locomotive engineer for a period of about twenty-three years immediately preceding this explosion which occurred shortly after midnight on appellant's line of railroad near Salem, Illinois. It is conceded that decedent was at the time employed in interstate commerce so as to bring this case within the purview of the Federal Employers' Liability Act. Section 1 of that act provides that the carrier shall be liable for the injury or death of an employee which results, in whole or in part, from the negligence of any of its officers, agents or employers, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, etc., or other equipment. Section 2 of the Federal Boiler Inspection Act, as amended June 7, 1924, is as follows:

"It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28, 29, 30, and 32, and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." [U. S. C. A., Title 45, sec. 23.]

Under this section, as said in B. & O. Railroad Co. v. Groeger, 266 U. S. 521, 527, the carrier's duty "to have the boiler in a safe condition to operate so that it could be used without unnecessary peril to its employees was absolute and continuing. No notice to the defendant, actual or constructive, of the defects or unsafe condition of the boiler was necessary to plaintiff's case. Defendant is liable if its breach of duty contributed to cause the death." Also, see Lehigh Valley Railroad Company v. Beltz, 10 Fed. (2d) 74, 76.

However, as said in 2 Roberts on Federal Liabilities of Carriers (2 Ed.), page 1714: "So, even where the carrier is shown to have violated one of the federal safety statutes, if the negligent conduct of the employee was the sole cause of the injury and the violation of the statute by the carrier was not, in whole or in part, a contributing cause, then the carrier is not liable." Also, on pages 1717-20 of the same text it is said: "On the other hand, if such causal relation does not appear, in any legitimate view of the evidence, and a finding of the existence must rest wholly upon speculation or conjecture, the question may be withdrawn from the jury, or if sub-

mitted, the verdict set aside." The Federal decisions are strict in their requirement of proof of such causal relation by plaintiff. [Lang v. New York Central Railroad Co., 255 U. S. 455; Davis v. Wolfe, 263 U. S. 239; Chicago, Milwaukee & St. Paul Ry. Co. v. Coogan, 271 U. S. 472, 474; New York Central Railroad Co. v. Ambrose, 280 U. S. 486, 489, 490; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333; Burnett v. Pennsylvania Railroad Co., 33 Fed. (2d) 579, 580; Lynch v. D. L. & W. Railroad Co., 58 Fed. (2d) 177, 178. Also see Harper v. Terminal Co., 187 Mo. 575, 586, 86 S. W. 99; Kane v. Mo. Pac. Railroad Co., 251 Mo. 13, 26, 27 et seq., 157 S. W. 644; Hamilton v. Ry. Co., 318 Mo. 123, 133-35, 300 S. W. 787.]

■ This case was tried by plaintiffs on the theory that there was a violation of Interstate Commerce Rule No. 25, in that two or more adjacent stay bolts in the boiler were broken, that this condition weakened the support of the crown sheet of the boiler, that the boiler also contained a slimy substance or sediment in large quantity, and on account of these facts said boiler was not in a proper condition or safe to operate and exploded. The case was tried by defendant on the theory that the explosion was not caused by any defects in the boiler or appurtenances thereof, but was caused solely by low water in the boiler.

Plaintiffs' evidence as to alleged defects in the boiler rests upon the testimony of their witnesses, Aulmiller and Martin. Aulmiller was a member of defendant's wrecking crew which reached the scene of the explosion two or three hours thereafter. He said that when he got to the wreckage "the engine was on the wheels" and the boiler was on the sidetrack down the track "farther away than the engine frame." When daylight came he inspected the boiler and the stay bolts in the crown sheet. His direct testimony as to this investigation was as follows:

"Q. Tell us what you noticed with reference to the stay bolts? A. Well, I noticed three that were old breaks.

"Q. Which way? A. Right together.

"Q. Right together in one row? A. That showed an old break.

"Q. Aside from those three adjacent to each other, did you see any other broken stay bolts—I don't mean old ones, new ones? A. There were all kinds of new breaks.

"Q. How can you tell by looking the difference between an old and a new break? A. Well, scale and corrosion will form on an old break, and it is not sticky like a new break.

"Q. Those broken three in a row, what position or what kind of stay bolts were they, up-and-down stay bolts that separated the crown sheet or crossways? A. Up and down.

"Q. Three up and down? A. Yes, sir.

"Q. And how far were the up-and-down stay bolts, when in

proper position, how far are they apart, how many inches? A. Something like four inches apart.

"Q. How long is a stay bolt in length from the crown sheet— A. Well, in that size boiler I suppose eighteen or twenty inches.

"Q. How much in diameter? A. Oh, about an inch or an inch and an eighth, something like that; I didn't measure it.

"Q. Did you notice anything else there out of the usual besides the stay bolts; I mean by that any sediment or mud or slime? A. Sure; the whole place was just pasted with mud and stuff blown out of the boiler.

"Q. Where was the evidence of it? A. On the tank behind the engine; it was on the cars and on the wreckage of all kinds laying around.

"Q. Was any on the boiler itself; did you see it on the boiler? A. Well, some. The boiler was not blasted as bad as the rest of the stuff."

On cross-examination he testified on the same subject as follows:

"Q. When was it you went up there and found those three broken stay bolts? A. The morning of the wreck.

"Q. And you remember that there were three old breaks? A. Yes; I do.

"Q. And they were all right in a row? A. Yes, sir.

"Q. Those were all the old breaks that you found? A. I didn't look for any more. I just—they were so plain I walked up, and by looking at it I seen it.

"Q. Did you get down and examine it to find whether it was an old or new break? A. Can I tell anything I want?

"Q. No. A. I done it to convince my own mind what blowed it up. We were all talking, and I done it to convince myself.

"Q. You wouldn't think three stay bolts loose would cause a boiler to blow up? A. It would weaken it.

"Q. You only saw three that you say were old? A. That is all I seen.

"Q. And you remember distinctly those three were right in line? A. Yes, sir."

Martin, who had been in the employ of the Frisco Railroad about twenty years, testified on direct examination as to the effect of broken bolts in the crown sheet and of foreign matter in water used in a locomotive boiler, as follows:

"Q. Are you familiar with the construction and maintenance of stay bolts in crown sheets of the type I have mentioned? A. Yes, sir.

"Q. And have been for a number of years? A. Yes, sir.

"Q. Can you tell us, with that experience, what tendency there would be, if any, in the event stay bolts were fractured, three of them adjacent to each other, what the tendency would be? A. Well, it would weaken the support of the crownsheet.

"Q. If the crown sheet comes down for any reason at all into the firebox, what happens, if there is a collapse? A. If it collapses it will cause an explosion.

"Q. Have you had experience in the operation of a boiler or engine over those years where there would be sediment in some quantity sufficient to spread itself on the engine after an explosion and spread itself on the ground; where sediment of that kind is in a boiler, what happens? A. It causes the engine to foam.

"Q. Where it foams, what is the result as far as the engineer is concerned? A. Well, it causes a light substance to form on the body of the water and makes it very hard to determine how much solid water you have in the boiler.

"Q. Is that the reason boilers are supposed to be washed out from time to time and kept clean? A. Yes, sir.

"Q. Can you explain that foaming process and how, in effect, it deceives the engineer so he does not know the amount of water in a boiler; how does it operate or look? A. Well, this foamy substance that forms on top of the body of the water, that is very deceiving, and it looks something similar to water.

"Q. Does the sediment itself go to the bottom or stay near the top? A. The sediment goes to the bottom.

"Q. Does that settling of sediment in the bottom of the crown sheet, does it have anything to do with making it easy to overheat, or not? A. It will cause a mud burn if enough gets in there.

"Q. If you get mud burns on your crown sheet— A. That blisters or weakens the crown sheet.

"Q. And makes it susceptible to explosion? A. It will if there is enough of it, yes."

His cross-examination as to these matters was as follows:

"Q. You say that foam gets on top of the water, and you can't tell how much water you have; you mean by that you cannot tell how much foam is on top? A. There is a foamy substance that forms and you cannot tell how much solid water he has.

"Q. The engineer does not look in the boiler to determine the water? A. No, but he looks in the water glass.

"Q. He also has water cocks? A. Yes, sir.

"Q. And he turns them on to see how much water he has? A. Yes, sir.

"Q. He can always tell how much water he has by turning them? A. Not when the engine is foaming bad, you can't.

"Q. What causes the foam? A. Foreign substance in the water.

"Q. There has to be a foreign substance to make it foam? A. Yes, sir.

"Q. You did not see this accident? A. No, sir.

"Q. And you did not see this engine at any time before or afterwards? A. Never did, that I know of.

"Q. And you don't know what kind of an engine it is, do you? A. No, sir.

"Q. What foreign substance in water will make foam? A. Well, there is several different things; leaves in the fall of the year will; soap will.

"Q. Leaves in the water? A. Yes. Soap will make it foam; alkali, water from where there is a dead animal or a rat, or there may be other things.

"Q. Well, how much foam will a dead rat cause in a tank of water; how much foam will it produce? A. I can't tell you that.

"Q. The dead rat would have to be in the boiler to make it foam? A. Not necessarily, but the place where the water came from, the water tank.

"Q. Just one dead rat in the water, once in the water, will make it foam later on? A. I think so.

"Q. One dead rat will do it? A. Yes, sir.

"Q. What makes you say that a dead rat in water will make it foam? A. I just said dead animal, and mentioned rat. It wasn't necessary to be a rat; a cat or any dead animal.

"Q. You mentioned soap? A. Yes, sir.

"Q. What else? A. Alkali in water.

"Q. What alkali? A. Alkali that might be in water; some water contains more alkali than others."

It is apparent from the foregoing that plaintiffs' evidence fell short of proving any causal connection between the broken stay bolts and the explosion. There was nothing to indicate that the crown sheet first became loosened or torn or collapsed at that point, or that these broken stay bolts actually caused or contributed to cause the explosion. Even though witness Aulmiller was permitted to testify that he examined the boiler "to convince my own mind what blowed it up," he was unwilling to say that he even thought "three stay bolts loose would cause a boiler to blow up." The most he would say in response to this question was: "It would weaken it." Likewise, witness Martin, when confronted with the hypothetical question of what tendency, if any, there would be in event three stay bolts adjacent to each other were fractured, only said: "Well, it would weaken the support of the crown sheet." Such testimony was not sufficient to carry plaintiffs' burden of proof. In B. & O. Railroad Co. v. Groeger, 266 U. S. 521, 527, it was held that mere proof of violation of Interstate Commerce Commission Rule No. 25 requiring that no boiler shall be allowed to remain in service when there are two adjacent stay bolts broken was insufficient to take a boiler explosion case to the jury. Proof of causal connection between such a condition and the explosion must be shown, and such was not shown by mere verbal iteration of the self-evident fact that the crown sheet would be weakened by this condition. The question the

jury had to determine was whether these broken stay bolts did so weaken the crown sheet as to cause or contribute to cause the explosion, and plaintiffs offered no substantial evidence to support their contention that they did.

Nor does it appear that respondents are in any better position as to their contention that the water used in the boiler contained a foreign substance which caused it to foam so the engineer in operating the locomotive and boiler could not tell "how much solid water" he had in the boiler. While witness Martin, on direct examination, in answer to a question suggesting quantity rather than kind of sediment, said "it causes the engine to foam," on cross-examination he qualified this answer by naming certain foreign substances that would cause the water to foam, and adding "or there may be other things," thereby clearly indicating that not every foreign substance would produce this result, and there was no evidence that any of the substances he named were in the water, or that the water contained any foreign substance the character of which would cause it to foam, nor was there any evidence that the water in this boiler did in fact foam. Furthermore, although this witness testified that the sediment itself goes to the bottom and settling in sufficient quantity on the bottom of the crown sheet would cause a "mud burn" that would blister or burn the crown sheet, there was no evidence whatever of any "mud burn."

An examination of defendant's evidence discloses nothing to supply plaintiffs' lack of proof. On the contrary, it contains much to support defendant's contention that the explosion was due solely to the engineer's own failure to keep sufficient water in the boiler, but disregarding this, as we must in ruling the sufficiency of defendant's demurrers to the evidence, the most that can be said of plaintiffs' proof is, as was said in New York Central Railroad Co. v. Ambrose, 280 U. S. 486, 490, "the accident may have resulted from any one of several causes, for some of which the company was responsible, and for some of which it was not. This is not enough." In such case a verdict for plaintiff would necessarily rest on conjecture.

It is always a matter of grave concern to deny a death claim under the circumstances here presented, but where, as in this instance, no case was made for the jury the verdict should not stand and our duty to reverse is plain. It is, therefore, ordered that the judgment be reversed. All concur.