## CENTRAL VERMONT RY. CO. v. PERRY.

(Circuit Court of Appeals, First Circuit. January 5, 1926. Rehearing Denied March 3, 1926.)

No. 1887.

**1. Master and servant ⟨⟩112(1)—Injury from violation of Safety Appliance Act actionable under federal Employers' Liability Act.**

Federal Employers' Liability Act April 22, 1908, as amended April 5, 1910 (Comp. St. §§ 8657–8665), gives right of action for injury or death of employee due to violation of duty imposed by Safety Appliance Act March 2, 1893 (Comp. St. §§ 8605–8612), or its supplements, Act April 1, 1896 (Comp. St. § 8610), Act March 2, 1903 (Comp. St. §§ 8613–8615), Act April 14, 1910 (Comp. St. § 8617 et seq.), Act Feb. 17, 1911, and Act March 4, 1915. (Comp. St. § 8630 et seq.), in failing to equip and maintain cars and engines as therein required, as well as for death or injury arising from negligence of servants or failure to provide equipment.

**2. Master and servant ⟨⟩110—Safety Appliance Act and rules of Interstate Commerce Commission do not prescribe footboards on tender of engine.**

Safety Appliance Act March 2, 1893 (Comp. St. §§ 8605–8612), as supplemented by Act April 1, 1896 (Comp. St. § 8610), Act March 2, 1903 (Comp. St. §§ 8613–8615), Act April 14, 1910 (Comp. St. § 8617 et seq.), par-

ticularly sections 2 and 3, and Act Feb. 17, 1911, Act March 4, 1915 (Comp. St. § 8630 et seq.), and rules of Interstate Commerce Commission do not prescribe footboards at end of tender of engine, but only provide manner of construction, if used.

**3. Master and servant ⟨⟩276(5)—Evidence held insufficient to show death of brakeman due to absence of footboard on tender.**

Evidence *held* insufficient to warrant finding that death of brakeman on engine used for switching was due to absence of footboard at rear of tender.

Anderson, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of New Hampshire; George F. Morris, Judge.

Action by Julia Perry, administratrix, against the Central Vermont Railway Company. Judgment for plaintiff, and defendant brings error. Judgment vacated, verdict set aside, and case remanded for further proceedings.

Eri C. Oakes, of Lancaster, N. H. (Shurtleff, Oakes & Hinkley, of Lancaster, N. H., and William R. McFeeters, of St. Albans, Vt., on the brief), for plaintiff in error.

Alexander Murchie, of Concord, N. H. (Murchie & Murchie, of Concord, N. H., and Raymond Trainor, of White River Junction, Vt., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. In this action the plaintiff seeks to recover damages for the death of her husband, who was killed in the yard of defendant railway company at White River Junction, Vt., while engaged in work connected with interstate commerce. The action was brought in the federal District Court for New Hampshire, the state and district of which she was a citizen and resident. In her declaration the plaintiff alleged that, at the time of the accident, the defendant company was operating a railroad in Vermont, and as such was a common carrier engaged in interstate commerce; that her intestate was in the employ of the defendant as a brakeman engaged in interstate commerce; and that while so employed he was injured by being thrown beneath the wheels of a locomotive then and there used as a switching engine in interstate commerce—"said injury being caused (1) by reason of the unsuitable, dangerous, and negligent condition of said locomotive; (2) by failure of said defendant to provide a safe work place for said deceased; and (3) by the failure of

said defendant to warn and instruct said deceased of the hazards and dangers caused by the negligent condition of said locomotive—by reason of which negligence on the part of said defendant, its officers, agents, and employees, said deceased received injuries as aforesaid, from which, after conscious suffering, he died on the 12th day of May, 1921, whereby under an act of Congress entitled 'An act relating to the liability of common carriers by railroad to their employees in certain cases,' approved April 22, 1908, as amended April 5, 1910, also under an act of Congress entitled 'An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes,' approved March 2, 1893, as amended April 1, 1896, March 2, 1903, and April 14, 1910, and also under an act of Congress entitled 'An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto,' approved February 17, 1911, as amended March 4, 1915, an action has accrued to the plaintiff," etc.

The defendant pleaded a general denial and assumption of risk.

There was a trial by jury, and a verdict for the plaintiff for $7,600. Judgment was entered, and this writ of error prosecuted.

The errors relied upon are that the court erred in denying the defendant's motion for a directed verdict, in its charge to the jury, in the admission of evidence, and in permitting plaintiff's counsel to make certain statements in his closing argument.

The Employers' Liability Act of April 22, 1908, in section 1, provides:

"Every common carrier by railroad while engaging in commerce between any of the several states or territories, or between any of the states and territories, or between the District of Columbia and any of the states or territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." Comp. St. § 8657.

And in sections 3 and 4 of the act (Comp. St. §§ 8659, 8660) it is provided that in actions brought under or by virtue of the provisions of the act an employee injured or killed should not be held to have been guilty of contributory negligence or to have assumed the risks of his employment "in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

[1] The Safety Appliance Act of March 2, 1893 (Comp. St. §§ 8605–8612), and the Acts of April 1, 1896 (Comp. St. § 8610), March 2, 1903 (Comp. St. §§ 8613–8615), April 14, 1910 (Comp. St. § 8617 et seq.), Feb. 17, 1911, and March 4, 1915 (Comp. St. § 8630 et seq.), supplementing and enlarging the provisions of the Act of March 2, 1893, all of which were enacted "to promote the safety of employees and travelers upon railroads," impose an absolute duty upon common carriers by rail to equip their cars with certain appliances and their locomotives with safe and suitable boilers and appurtenances, and although these provisions of law do not in express terms confer a right of action upon an employee injured because of a failure to comply with such requirements, it has been held that by implication they give him a right of action for personal injuries not resulting in death. Texas & Pacific Ry. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874. And where the injury resulted in death and a statute of the state where the accident occurred gave a right of action for death, it has been held that an action under such death statute might be maintained by the deceased employee's representative, relying upon the duty imposed by the Safety Appliance Act and its supplements. St. Louis Iron Mountain Ry. v. Taylor, 210 U. S. 281, 284, 285, 28 S. Ct. 616, 52 L. Ed. 1061; C., B. & Q. Ry. v. United States, 220 U. S. 559, 571, 579, 31 S. Ct. 612, 55 L. Ed. 582; Delk v. St. Louis & San Francisco R. R. Co., 220 U. S. 580, 31 S. Ct. 617, 55 L. Ed. 590; Schlemmer v. Buffalo, Rochester & Pittsburg Ry. Co., 220

U. S. 590, 31 S. Ct. 561, 55 L. Ed. 596. And since the enactment of the Employers' Liability Act of 1908, which gives a right of action for death as well as for personal injuries, it has been held that that act, although it in terms authorizes an action based on negligence only (the failure to exercise the care of the average prudent man), taken in connection with the Safety Appliance Act and its supplements, authorizes an action for personal injuries or death due to the breach of a duty imposed by the Safety Appliance Act and its supplements, irrespective of negligence. Baltimore & Ohio R. R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Great Northern R. R. Co. v. Donaldson, 246 U. S. 121, 38 S. Ct. 230, 62 L. Ed. 616, Ann. Cas. 1918C, 581; St. Joseph & Grand Island Ry. Co. v. Moore, 243 U. S. 311, 37 S. Ct. 278, 61 L. Ed. 741; Louisville & Nashville R. R. Co. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. Ed. 931 (where, apparently, was applied the same construction to the Employers' Liability Act of Georgia and the federal Safety Appliance Act); Southern Ry. Co. v. Crockett, 234 U. S. 725, 34 S. Ct. 897, 58 L. Ed. 1564; Director General of Railroads v. Ronald (C. C. A.) 265 F. 139, 140; Hines v. Smith (C. C. A.) 275 F. 766. And the result is to give to section 1 of the Employers' Liability Act of April 22, 1908, the same effect as though it read:

"Every common carrier by railroad while engaging in commerce between any of the several states or territories, or between the District of Columbia and any of the states or territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment [or due to the violation by such common carrier of any statute enacted for the benefit of employees]."

So construed and read, the Employers' Liability Act (Comp. St. §§ 8657–8665)

gives a right of action to an employee not only for an injury or death arising out of the negligence of the officers, agents or employees of the carrier or due to the carrier's negligence in providing cars, engines, appliances, machinery, track, roadbed, boats, wharves or other equipment, but due to the violation of a duty imposed by the Safety Appliance Act and its supplements for failure to equip and maintain its cars and engines as therein required. See Davis v. Manry, 266 U. S. 401, 403, 45 S. Ct. 163, 69 L. Ed. 350.

The plaintiff's declaration charged negligence only. The ground on which the case was submitted to the jury was not negligence, but the breach of a duty or duties claimed to be imposed upon the carrier by the Safety Appliance Act and its supplements. No objection, however, was taken to the declaration on this account, and it may be regarded as amended to conform to the issue tried. The claimed imposed duties upon which the plaintiff relied were (1) the failure of the defendant to equip the tender with a grabiron or handhold extending across the rear of the tender, and (2) its failure to provide a footboard across the rear of the tender and located from 9 to 12 inches above the rail.

The only evidence in the case was introduced by the plaintiff. It appeared that the plaintiff's husband, the deceased, was employed by the defendant as a member of a switching crew in its yard at White River Junction; that on May 11, 1921, he sustained injuries (from which he died the following day) by being run over by a road engine while backing up to couple the tender to three empty coal cars; that the road engine was then being used, as the switching engine ordinarily used by the crew had been taken to the roundhouse for repairs. The switching crew consisted of the engineer, Dunlay, the fireman, Comstock, the conductor, Learnard, the head brakeman, Perry, the deceased, and the rear-end brakeman, Carroll. It appeared that the crew, on turning in the switching engine, were directed to take the road engine to use in switching; that they took it about half past 1 in the afternoon; that after doing various pieces of work with it (it then being nearly half past 3), they began making the movement in question when the accident occurred, which was about three minutes before completing the day's work; that at the time the engine was backing to make the coupling, the fireman, Comstock, had left to go home; that the engineer, Dunlay, was in the cab operating the engine; that

Learnard, the conductor, was riding on the tender, standing on the step located at the left side of the rear end of the tender as it was backing, and holding on to the grabiron or handhold that extended up and down the tender at that corner; that Perry, the deceased, was standing on the top of the water tank, which constituted the rear end of the tender; and that Carroll, in some way not disclosed by the evidence, had gone ahead to the coal cars, and at the time of the accident was standing on the ground near the rear end of the further coal car.

The pictures of the tender and a diagram (drawn to scale) of its rear end, that were introduced in evidence, disclose that it was equipped, not only with a handhold and step, as above stated, at the place where the conductor was standing, but with a similar step and handhold at the opposite or right-hand side of the tender as it was going; that the rear end of the tender was 8 feet and 10 inches wide and about 5 feet high, measuring from the top of the sill or buffer beam; that extending across the rear end of the tender was a handhold, which was raised about 6 inches above the top of the tank and distant about 5½ feet from the top of the sill or buffer beam; that at the right side of the rear end was an iron ladder, 15 inches wide, extending down from the top of the tender or tank about two-thirds of the distance and to within about a foot and a half of the bottom of the tank and the top of the sill or buffer beam, which at that point projected out about 6 inches and ran across the rear of the tender; that the ladder was within 17½ inches of the right-hand side or corner of the tender as it was going, and was 6 feet and 1½ inches from the side or corner where Learnard stood. It also appeared that at this end of the tender and attached to the sill or buffer beam was a double lever, operative from either side, for controlling the pin in coupling and uncoupling the automatic couplers; this lever being provided with handles at the ends adjacent the steps located at or near the respective corners at the rear of the tender. There was also attached to the sill or buffer beam two grabirons or handholds, each of which was about 1 foot and 7 inches long, the outer ends of which were located about 1 foot and 4 inches from each end of the sill or buffer beam. The distance from the top of the sill or buffer beam to a point about 9 inches from the top of the rail was about 2½ feet. It is at this point, 9 inches or so above the rail, that the plaintiff claims the engine should have been equiped with a footboard, the lack of which she says was the cause of Perry's injuries.

More broadly stated, the plaintiff's contention is that the Safety Appliance Act and its supplements required that an engine used in shifting should be equipped with a secure footboard, made in one or two sections, across the rear end of the tender at the height of from 9 to 12 inches above the top of the rail; that, as the engine in question did not have such a footboard, the defendant was guilty of a breach of duty imposed by these acts for the benefit of employees, which caused or contributed to cause the death of Perry.

In support of this contention she introduced in evidence, subject to defendant's exception, certain rules of the Interstate Commerce Commission having the heading, "Safety Appliance Standards for Locomotives, as Fixed by Order of the Commission Dated March 13, 1911," and as a subheading, "Steam Locomotives Used in Switching Service," reading as follows:

"Footboards.
"Number:
    "Two (2) or more.
"Dimensions:
    "Minimum width of tread, ten (10) inches, wood.
    "Minimum thickness of tread, one and one-half (1½) perferably two (2), inches.
    "Minimum height of backstop, four (4) inches above tread.
    "Height from top of rail to top of tread, not more than twelve (12) nor less than nine (9) inches.
"Location:
    "Ends or sides.
    "If on ends, they shall extend not less than eighteen (18) inches outside of gauge of straight track, and shall be not more than twelve (12) inches shorter than buffer beam at each end.
"Manner of Application:
    "End footboards may be constructed in two (2) sections: Provided that practically all space on each side of coupler is filled; each section shall not be less than three (3) feet in length.
    "Footboards shall be securely bolted to two (2) one (1) by four (4) inches metal brackets: Provided footboard is not cut or notched at any point.
    "If footboard is cut or notched or in two (2) sections, not less than four (4) one (1) by three (3) inches metal brackets shall be used, two (2) located on each side of the coupler. Each bracket shall be securely

bolted to buffer beam, end sill or tank frame by not less than two (2) seven-eighths (⅞) inch bolts.

"If side footboards are used, a substantial handhold or rail shall be applied not less than thirty (30) inches nor more than sixty (60) inches above tread of footboard. * * *

"End Handholds.

"Number:

"Two (2).

"Dimensions:

"Minimum diameter, one (1) inch, wrought iron or steel.

"Minimum clearance, four (4) inches, *except* at coupler casting or braces, when minimum clearance shall be two (2) inches.

"Location:

"One (1) on pilot buffer beam; one on rear end of tender, extending across front end of locomotive and rear end of tender. Ends of handholds shall be not more than six (6) inches from ends of buffer beam or end sill, securely fastened at ends.

"Manner of Application:

"End handholds shall be securely fastened with bolts or rivets."

It is evident from reading these rules that, if the Interstate Commerce Commission was authorized by the provisions of the Safety Appliance Act and its supplements to require footboards on steam locomotives used in switching service and to define their location, they did not, by these rules, require footboards on the ends of such locomotives, for they state that the location of such boards may be on the "ends or sides," and, "if on ends," how they shall be applied. And the Supreme Court in Baltimore & Ohio R. R. Co. v. Groeger, supra, at page 525 (45 S. Ct. 171), in considering a rule of the Commission which read, "If boilers are equipped with fusible plugs, they shall be removed and cleaned of scale at least once every month," said, "This does not purport to require fusible plugs to be used," and the same is true of the rule now before us.

The Safety Appliance Act of March 2, 1893, as supplemented by the Act of April 14, 1910 (36 Stat. at Large, p. 298, c. 160 [Comp. St. §§ 8618, 8619]), provides:

"Sec. 2. That on and after July first, nineteen hundred and eleven, it shall be unlawful for any common carrier subject to the provisions of this act to haul, or permit to be hauled or used on its line any car subject to the provisions of this act not equipped with appliances provided for in this act, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grabirons on their roofs at the tops of such ladders: Provided," etc.

"Sec. 3. That within six months from the passage of this act the Interstate Commerce Commission, after hearing, shall designate the number, dimensions, location, and manner of application of the appliances provided for by section two of this act and section four of the act of March second, eighteen hundred and ninety-three, and shall give notice of such designation to all common carriers subject to the provisions of this act by such means as the commission may deem proper, and thereafter said number, location, dimensions, and manner of application as designated by said commission shall remain as the standards of equipment to be used on all cars subject to the provisions of this act," etc.

Section 4 of the Act of March 2, 1893, specified in section 3 of the Act of April 14, 1910, reads:

"Sec. 4. That from and after the first day of July, eighteen hundred and ninety-five, until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grabirons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

This section (section 4) was in terms made applicable to tenders of engines by the supplement of March 2, 1903, and the number and location of the grabirons thus required was standardized by the orders of the Interstate Commerce Commission under the authority conferred upon it by the Act of Congress of April 14, 1910, which provided for two rear-end handholds on tenders of engines "one near each side of rear end of tender on face of end-sill."

If it be conceded that a tender alone or an engine and tender combined is a car within the meaning of section 2, it is evident that Congress did not, by the language there used, undertake to designate the character of car to which running boards should be attached, but left that question open to be determined as a question of fact or by the rules of the Commission.

That the Interstate Commerce Commission so construed section 2 is disclosed by its rules standardizing appliances under the heading "Specifications Common to All

Steam Locomotives," where they use the term "running boards," not "footboards," and prescribe their number, dimensions, location, and manner of application, and the locations prescribed on locomotives are one on each side of the boiler extending from the cab to near the front end of the pilot beam. While the Commission by its rules requires "running boards" on locomotives, it makes no provision for them on tenders, except tenders known as the Vanderbilt type, as to which it provides that they shall be equipped with "running boards" and defines the number, character and location of them on such a tender. The rules also show that the Commission did not interpret the term "running boards," as used in section 2, as meaning footboards, and that they understood the term as there used to be an appliance over which a trainman would pass from one end of a car or engine to the other in the performance of his duties, and not a place where men might stand and ride about a freight yard, the function of a footboard. Running boards are commonly used on the top of box freight cars, and along the sides of the boilers of locomotives and not elsewhere. Their use on tenders is exceptional and limited to a type of tender not here in question, as the rules of the Commission show.

[2] But whether a footboard is a running board within the meaning of section 2 we do not decide, as we are of the opinion that the Commission, if it had authority to prescribe footboards, has not undertaken to require one on the end of a tender of an engine used in shifting, but only to say, if one is used there, how it shall be constructed and applied.

In its charge the court instructed the jury in substance that the acts of Congress and the regulations of the Interstate Commerce Commission required railroads to equip their engines and tenders used in switching with footboards at the ends and with end handholds; that the defendant had done neither of these things; that its failure in these respects was the breach of an absolute duty imposed upon it; that the main question in the case for the jury to determine was "just how the deceased met his death"; and that "if the absence of a footboard or end handhold [contributed] * * * to the deceased's injury then there [was] * * * absolute liability on the part of the railroad and [their] * * * verdict should be for the plaintiff."

As the Safety Appliance Act and its supplements do not require a footboard at the rear end of the tender of a shifting engine and the regulations of the Interstate Commerce Commission do not require one, and as the evidence indubitably showed that the tender was provided with a handhold extending across its rear end, we are of the opinion that the court erred in its instruction to the jury.

[3] But, if it be assumed that the Appliance Act and its supplements required the defendant to equip the rear of its tender with a footboard constructed as above described and a handhold extending across the rear of the tender, we think the evidence did not warrant the jury in finding that Perry's death was attributable to the want of either, and that the defendant's motion for a directed verdict should have been granted.

It was not attributable to the want of a handhold, for it was not wanting, and the evidence, so far as it disclosed how the accident occurred, was of such a character as to render it a pure matter of conjecture that Perry's death was attributable to the want of a footboard. There were only two witnesses who gave any testimony tending to show how the accident occurred, and their testimony was such as to render a finding that it was attributable to the want of a footboard mere conjecture. Those witnesses were Learnard, the conductor, and Carroll, the rear brakeman. Learnard, as before stated, was standing on the left side of the tender, as it was going, at or near its rear end. He testified that when the tender was backing, and was within 25 feet or less of the end of the nearest coal car, he saw Perry put one foot on the rung of the ladder as if intending to descend it; that then his attention was withdrawn momentarily (a matter of seconds) while he looked toward the coal cars, when, all of a sudden, he noticed an object flash by and saw Perry on the ground below him, with his body outside the track, but his left leg over the rail. Carroll testified that, while he was standing beside the rear coal car, he heard a noise as if caused by the falling of the cover to the manhole on the tank of the tender; that he saw Perry fall; that whether he fell from the top of the tender, or after placing one foot on a rung of the ladder, he could not tell, but that he saw him through the period of falling. This evidence would not warrant a finding that his fall was in any way attributable to the want of a footboard, which was nowhere near him, but that he fell before getting down the ladder.

There was evidence, however, that it was Perry's duty to couple the tender to the coal cars, or assist in doing so, and the plaintiff

contends that, as Learnard testified he saw Perry put one foot on the rung of the ladder, the jury could disregard the evidence of Carroll, on the ground that he was so far away (about 120 feet) and in such a position that he could not see Perry on the ladder (although Carroll testified he could and did see him all the time), and could infer that Perry, in the performance of his duty, descended the ladder and, on reaching the place where the sill or buffer beam extended about 6 inches out from the bottom of the tender, with his left foot on the sill or buffer beam, he reached down with his right foot, expecting to find a footboard some 2½ feet below and, not finding it, threw himself with his left foot towards Learnard in an endeavor to get clear of the track, notwithstanding the drawbar and coupler were between him and that side of the track. This seems to us to be the height of conjecture and unwarranted.

If it was Perry's duty to assist in making the coupling, and if, disregarding the testimony of the eyewitnesses, who saw what he did and what happened to him, it could be inferred that he descended the ladder, it is a mere guess to conclude that, having reached the projection on the sill or buffer beam, he attempted to step down 2½ feet directly in the path of the tender, with the expectation of finding a footboard (which he undoubtedly knew was not there, and which he could have seen was not, had he looked), and, not finding it, undertook to throw himself past the projecting drawbar and coupler to Learnard's side of the track. Had he descended the ladder to perform his duties, he naturally would have availed himself of the facilities provided for his protection in performing them, and, on descending, have taken hold of the handhold adjacent the ladder, and gotten upon the step there provided, where he could remain, if he desired, and operate the coupling device (Boehmer v. Penn. R. R. Co., 252 F. 553, 554, 165 C. C. A. 3), or, if he preferred, could have stepped to the ground in a place of safety, where he likewise could have assisted in making the coupling. If what he did might be inferred from what his duties required him to do, and what he reasonably might be expected to do in performing them, it could not be inferred that his death was attributable to the want of a footboard, as the duty he was to perform did not require him to go where a footboard would be located.

The judgment of the District Court is vacated, the verdict set aside, and the case is remanded to that court for further proceedings not inconsistent with this opinion; costs to the plaintiff in error.

ANDERSON, Circuit Judge (dissenting). I think the court below was right, and that the judgment should be affirmed. The railroad was using a road engine for switching purposes. This engine was not equipped as the law, including the rules of the Interstate Commerce Commission, required a switching engine to be equipped. It was for the jury to say whether this lack of equipment was a contributory cause of Perry's death. I think the evidence plainly indicated that it was. The majority opinion amounts to holding that the use of this road engine as a switcher had, as matter of law, nothing to do with the accident. I can see no tenable ground for that holding.

### On Petition for Rehearing.

PER CURIAM. The plaintiff's petition for rehearing must be denied. A rule of the Interstate Commerce Commission requires two end handholds on tenders of engines, "one near each side of rear end of tender on *face of end sill.*" The engine in question was so equipped. It had handholds on the face of the end sill on each side of the drawbar.

Another rule requires end handholds on shifting engines: "One on *pilot buffer beam;* one on *rear end of tender.*" The one on pilot buffer beam "extending across front end of locomotive"; the "one on rear end of tender, extending across * * * *rear end of tender.*" The latter handhold, it will be observed, is not located on the *face of endsill,* as in the first rule mentioned, but on *rear end of tender* and across it. The rule does not otherwise specify where on the rear end of the tender it shall be located, but leaves that to the discretion of the carrier. It may extend clear across the rear end of the tender, or the ends of the handhold may set back not more than six inches, measured from the ends of the end sill. The tender in question had a handhold extending across its rear end as stated in our opinion of January 5, 1926. And in addition thereto, two handholds located on the face of the end sill on each side of the drawbar as disclosed in the evidence.

If it is now the plaintiff's contention that the above rule relating to a shifting engine required a handhold to be located on the *face of the end sill* at the rear of the tender, and such a handhold was not there, although others were, there was no evidence warranting a finding that its absence was a cause of

plaintiff's inquiry, and a finding that it was would be merely conjectual.

If in our opinion of January 5, 1926, we misconstrued the rule relating to footboards, that does not affect the conclusion there reached.

Petition denied.