PEARL SATTERLEE, Administratrix of RAY A. SATTERLEE, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—82 S. W. (2d) 69.

Division One, April 17, 1935.

944

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *I. M. Lee* for appellant.

*Thomas C. Swanson, Trusty & Pugh* and *Guy W. Green, Jr.,* for for respondent.

948

STURGIS, C.—The plaintiff as administratrix of her deceased husband recovered judgment for his death while in defendant's employ as head brakeman on an interstate freight train running from Afton, Oklahoma, to Kansas City, Missouri. The death occurred at Baxter Springs, Kansas, where the deceased fell from the rear end of the tender attached to the locomotive and was crushed by the wheels of the freight cars following it. The case is bottomed on a violation of the Federal Boiler Inspection Act, U. S. C. A., Title 45, Chapter 1. The petition charges negligence substantially in the general language of the United States statutes in that defendant used in interstate commerce a locomotive engine ''when the tank or tender and the appurtenances thereof at the rear end and on top of the tender, where plaintiff's deceased husband was required to be in his work, were not in proper condition and safe to operate in the service to which the same were being put, and so that the same could be employed in the active service without unnecessary peril of life and limb.'' It is then charged that at the time, March 27, 1929, and place mentioned, ''the deceased fell either from the *rear top* portion of the tender or he fell from the *rear lower* portion of said tender, and that either one or the other is true and that plaintiff does not definitely know which is true,'' but that in either event he fell and lost his life ''either because the *rear* of the tender was not in proper condition and safe to operate or the *top* of the tender was not in proper condition and safe to operate in said service.'' Defendant filed a general denial and went to trial on this petition, resulting in a judgment for plaintiff, from which defendant appeals.

The facts developed that this freight train of some fifty cars arrived at Baxter Springs and after doing some switching left there about eight thirty o'clock P. M., going north. The train crew consisted of the engineer, fireman, head brakeman (who was killed), rear brakeman, and conductor. It was then dark, had been raining and was yet misting rain. The next stop of the train was at Scammon, Kansas, some twenty miles north, and on arriving there it was discovered that the head brakeman was missing. The other trainmen at once made search and investigation but could find nothing except that the missing brakeman had left his lantern on the back end of the tender at the head of the rear ladder and his raincoat on his seat in the "dog house," a structure built about the middle of the tender and back of the coal bin for his use. Word was sent to the agent at Baxter Springs and search was made there, resulting in the dismembered body of the deceased being found on the track at the west rail about one thousand feet north of the depot at Baxter Springs. When the fate of the deceased was ascertained the train proceeded from Scammon, Kansas, passing through Cherokee, to Ft. Scott, a division point on defendant's railway system.

The evidence as to how and why deceased met his death is largely circumstantial. No one saw him alive after the train left Baxter Springs. The engineer testified for plaintiff that when the train was about ready to start from Baxter Springs the deceased lined up the switch connecting with the main line and signaled the train to proceed; that the engine was then four or five car lengths from the depot and that as it passed the depot, which was on the east, engineer's side, of the track, the deceased with his lantern boarded the rear east end of the tender, passed between the tender and the head freight car, and that he saw him no more, supposing, of course, that he crossed over to the ladder near the west side of the tender on which he would go up on the tender and to the "dog house" where he usually stayed between stations. This witness corroborated another witness, Gordon, called by defendant, in that deceased and Gordon, a fireman of a yard engine, were talking together on the depot platform shortly before the train pulled out. Gordon testified not only as to seeing the deceased getting on the tender at the right rear end, but that he mounted the tender, waved his lantern on top and started toward the "dog house" as the train was pulling out, having both his lantern and raincoat. The fireman testified that he saw the deceased in conversation with someone on the platform just as the engine was starting up. This evidence, together with the fact that the deceased's lantern was found on the tender and his raincoat in the "dog house" when the train reached Scammon, Kansas, is the substance of the evidence as to

whether the deceased ever reached the top of the tender and fell from there or fell while still at the foot of the rear ladder of the tender.

The evidence discloses that in getting on the tender at the right rear end the deceased grasped the vertical handhold there, stepped on the stirrup and then to the sill of the tender, twelve or thirteen inches wide, on which he would walk till reaching the rear end ladder and ascend to the top of the tender. The equipment of the tender and arrangement of the appliances will be shown by the following exhibit (Defendant's Exhibit 2):

There are two men shown here in the act of mounting the tender from the rear, but the one on the right shows the position of the deceased as he passed out of sight of the engineer.

When found, the body of the deceased showed that he had fallen just inside of the left or west rail. His body was severed with the lower part inside the west rail and the upper part outside. He was dragged some distance but the first mark showed him to have fallen just inside the west rail. The clear inference, and that is all we have, is that the deceased reached the ladder, or certainly very near thereto, and fell from the sill of the tender or from the top of the tender on or near the west rail of the track. The question to be considered is whether deceased's fall was due in whole or in part to some violation by defendant of the Boiler Inspection Act.

The trial court, at the close of all the evidence, overruled a demurrer thereto and submitted the case to the jury on both theories set forth in the petition, that is, (1) that deceased fell from the sill or rear of the tender in making his way along the sill or getting on the ladder, or (2) that he fell from the top of the tender after ascending the ladder.

The instruction for plaintiff covering the first theory first stated in general terms that the Acts of Congress make it unlawful for defendant railroad to use a locomotive on its line unless same, including the tender and all its parts and appliances, is "in proper condition and safe to operate in the service to which the same was being put, and so that it could be employed in the active service of such company without unnecessary peril to life or limb." Following this definition, which is in substantially the language of the Congressional Act, of what is unlawful for a railroad to do, the court then applies the law to the facts of this case in these words: "If you further find from the evidence that the defendant had placed on top of the tender the dog house and did so for the use of the head brakeman, and expected or intended that the brakeman should reach the same by passing along the rear end of the tank and up the ladder, and that such was a service to which same was being put by defendant;" (Note: We may here say that the evidence showed that the engine in question was manufactured by the Baldwin Locomotive Works, a standard and one of the largest builders of locomotives in the United States, and that the engine in question was a standard locomotive built by that company and had been in use some two years. It was not built, however, with what is termed the "dog house" near the center on top of the tender. That was placed there by the defendant at the request of the Switchmen's Union or some such organization. Originally the head brakeman was provided with a seat in the engine alongside of the fireman, but this was discarded when the "dog house" was built, warmed and made comfortable for his use. He could, of course, yet mount the engine at the front of the tender and reach the "dog house" by climbing over the coal bin, and steps were so provided, but we think it is clear that the brakeman was not only

permitted but was expected to and did habitually mount the tender at the rear end, as did the deceased on this occasion. This involved the use of the twelve or thirteen-inch sill at the rear end of the tender as a walkway in reaching the other side or the ladder leading to the top.) Plaintiff's instruction then proceeds: "And if you further find from the evidence that the rear of the tender was not in proper condition and safe to operate in the service to which it was being put and subjected Satterlee to unnecessary peril in getting along the rear from the right side and onto the ladder referred to for the purpose of going into the shanty called the 'dog house;' and if you further find from the evidence that Satterlee fell while making his way along the rear portion of said tender or in getting onto said ladder, and that such *violation of said law* by the defendant, if you find from the evidence it was so violated, either caused said Satterlee to so fall, or directly contributed to his injury and death, then you must return a verdict in favor of the plaintiff herein, and against the defendant railway company, and this would be true regardless of every other fact, circumstance or inference you may find shown by the evidence herein."

■ We think that the evidence, though largely circumstantial, is sufficient to warrant a finding that the deceased "while making his way along the rear end of the tender or in getting onto said ladder" fell to his death, and that the instruction rightly required that there must be a further finding that his so falling was due to "such violation of said law." In other words, there must be shown both a "violation of said law" and a causal relation between that and the deceased's fall and injury. The only violation of law mentioned in the instruction and to which the jury's attention is directed is that "the rear of the tender was not *in proper condition and safe to operate* in the service to which it was being put and subjected plaintiff's deceased husband to unnecessary peril in getting along the rear from the right side and onto the ladder referred to for the purpose of going into the shanty called the 'dog house.' "

■ Defendant insists that this instruction is too indefinite and general to be a proper guide to the jury and leaves the jury to decide both questions of law and fact. In this connection it is well settled that the Interstate Commerce Commission has power to and has made orders and rules with respect to the installation and maintenance of safety appliances such as handholds, which have the force and effect of law, and that any violation of the same constitutes negligence *per se*. [Fryer v. St. Louis-San Francisco Ry Co., 333 Mo. 740, 750, 63 S. W. (2d) 47; Napier v. Atlantic Coast Line, 272 U. S. 605.] ■ In the present case the plaintiff showed that while the end sill at the rear of the tender on which deceased had to walk in reaching the ladder was only twelve or thirteen inches wide, yet the only handhold available was the one on top of the .

rear end of the tender, which was too high for practical use, and which plaintiff claims is in direct violation of an order of the Commerce Commission reading: "On each end of *cars* with platform end sills, six or more inches in width, measuring from end post, or siding, and extending entirely across end of car, there shall be one additional handhold not less than 24 inches in length, located near the center of car, not less than thirty, nor more than sixty, inches above platform end sill." Defendant objected to this order of the Commerce Commission and insists that it applies only to cars proper and not to tenders which are parts of locomotives under the Boiler Inspection Act. If this order of the Commerce Commission applies to the tender in question, it was a clear violation of same in not having a handhold not less than twenty-four inches long, located near the center of the rear end of the tender, attached below the top. This, however, was a question of law and should not have been left to the jury to determine. In other words, if plaintiff's position is correct, the jury should have been instructed that the law required such handhold to be so located and should not have left that question to the jury.

While it has been ruled that for some purposes, especially under the Safety Appliance Act, the word "car" or "cars" will be construed to cover and include the engine and tender (Johnson v. Southern Pac. Co., 196 U. S. 1; United States v. Chicago, St. P., M. & O. Ry. Co., 42 Fed. (2d) 248; Philadelphia & R. Ry. Co. v. Winkler, 56 Atl. 112), yet when the wording and context of an order or rule of the Commerce Commission indicates otherwise, it will not be so construed (Davis v. Manry, 266 U. S. 401). Taking into consideration the wording and history of the order in question, we are inclined to hold, therefore, that the failure of defendant to have and maintain a horizontal handhold attached to the rear end of the tender below the top thereof is not negligence *per se* as being in violation of an express order of the Interstate Commerce Commission.

We do not agree, however, that because plaintiff did not prove a violation of a specific order or rule of the Commerce Commission as to installing and maintaining safety appliances, or that some such appliance installed and in use was defective or insecure, plaintiff failed to make a case for the jury and that a demurrer to the evidence should have been sustained. That is not the only method of making a case for the jury under the act in question. The plaintiff may show a violation of the standard of safety required by the act itself as well as of orders and rules prescribed by the Commerce Commission, the latter, however, when applicable, being paramount. Section 2 of the Boiler Inspection Act, as amended, provided that it shall be unlawful "for any carrier . . . to use any locomotive unless . . . its boiler, tender, . . . and ap-

purtenances thereof are in proper condition and safe to operate in the service to which same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb.'' Section 9 of this act provides that any common carrier violating this act or any rule or regulation made under its provisions, or any lawful order of any inspector, shall be liable, etc. There is a general rule of the Commerce Commission, No. 153, Roberts Federal Liabilities of Carriers, p. 2069, which provides that ''tanks shall be maintained . . . in safe and suitable condition,'' but this would seem not to add much, if anything, to the Congressional Act.

When this Boiler Inspection Act came before the United States Supreme Court in Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, it was urged that the rule of safety and liability prescribed by the act in requiring locomotives, tenders, and their appliances to be ''in proper condition and safe to operate in the service to which same are ''put'' was too general and indefinite for enforcement as a rule of safety in a damage suit action, but that court said: ''It imposes upon the carrier a higher degree of duty than theretofore existed. The requirement of the statute is substituted for the common-law rule which holds the employer to ordinary care to provide his employees a reasonably safe place in which, and reasonably safe appliances and machinery with which, to work. It is as definite and certain as is the common-law rule; and to hold that the duty imposed cannot be ascertained would be as unreasonable as it would be to declare that the common-law rule, which is ordinarily applied in personal injury actions brought by employees against employers, is too indefinite to be enforced or complied with.'' That was a case involving a locomotive boiler explosion in which the trial court submitted the case on two issues, one of which was said to be ''whether the explosion was caused in whole or in part by an unsafe and insufficient condition permitted by defendant in and about the crown sheet of the boiler,'' as to which it is further said: ''The court, in harmony with the provisions of Section 2, instructed the jury that the standard of defendant's duty was to put and keep the locomotive in proper condition and safe to operate, and that it would be a violation of defendant's duty if the engine, as to the crown sheet, was permitted to be in such condition that it could not be employed in the active service of the carrier, moving the traffic, without unnecessary peril to life or limb.'' This part of the court's instruction to the jury is not criticized, but is approved, as shown (by this language of the court: ''And we find no evidence in the record to support a finding that they (broken stay bolts) caused or contributed to cause the explosion. But we agree with the Circuit Court of Appeals that under *Section 2, of the statute*, there was sufficient evidence to sustain the

verdict, wholly apart from the broken stay bolts. Defendant's duty to have the boiler in a safe condition to operate, so that it could be used without unnecessary peril to its employees, was absolute and continuing. No notice to the defendant, actual or constructive, of the defects or unsafe condition of the boiler, was necessary to plaintiff's case. Defendant is liable if its breach of duty contributed to cause the death. We are bound to assume that the condition of the boiler (leaking steam into the fire box) at Foster, a very short time before the explosion, was as indicated by the testimony of the brakeman above referred to. His credibility and the weight properly to be given to his testimony were for the jury, and if the boiler was in the condition he described, it would not be unreasonable to conclude that a breach of duty of defendant caused or contributed to cause the explosion. We think it did not conclusively appear that the failure of deceased properly to operate the engine was the sole cause of the explosion. It follows that the evidence made a case for the jury." And in this case the court further said as to this Congressional Act: "That act was passed to promote the safety of employees, and is to be read and applied with the Federal Employers' Liability Act. Under the latter, defendant is liable for any negligence chargeable to it which caused or contributed to cause decedent's death (Section 1); and he will not be held guilty of contributory negligence (Section 3), or to have assumed the risks of his employment (Section 4), if a violation of Section 2 of the Boiler Inspection Act contributed to cause his death. (Cases cited.) By the last-mentioned section defendant was bound absolutely to furnish what before, under the common law, it was its duty to exercise ordinary care to provide. The carriers were left free to determine how their boilers should be kept in proper condition for use without unnecessary danger. The things required for that purpose were not prescribed or changed by the act; but use of boilers, unsafe to operate, as specified, was made unlawful, and liability for consequences follows violation of the act. . . . There is nothing in the act or in any rule, regulation, or order authorized by it, which specifies the use of fusible plugs. This, however, does not relieve the defendant of the duty to have and keep its boilers safe for use, as required by the act. [Great Northern Railroad Co. v. Donaldson, 246 U. S. 128.]"

In Gerow v. Seaboard Air Line Ry. (N. C.), 128 S. E. 345, plaintiff charged the defendant with violating the Boiler Inspection Act in failing to prevent, by use of a screen or otherwise, leaves, straw and other trash from getting into the tender and from there passing into the engine boiler, rendering the same dangerous and not safe to operate. The court there said: "The carriers, however, were left free to determine how their boilers should be kept in proper condition for use without unnecessary danger. The things required

for that purpose were not prescribed or changed by the act; but use of boilers, unless safe to operate, as specified, was made unlawful, and liability for consequences follows violation of the act. It is conceded that there is nothing in the act or in any rule, regulation, or order authorized by it, which specifies the use of strainers over the manhole or intake of the tender. This, however, does not relieve the defendant of the duty to have and keep its locomotives safe for use, as required by the act.'' In the Groeger case, supra, the plaintiff alleged a violation of a specific rule of the Interstate Commerce Commission forbidding the use of boilers with broken stay bolts. This requirement, the violation of which amounted to negligence *per se,* was found to have been violated, but as such was found not to have been in whole or in part the cause of the accident, that fact dropped out of the case for want of any causal connection. There was also evidence, however, showing that the use of fusible safety plugs made boilers more safe, but the court ruled that, in the absence of a specific requirement either in the Congressional Act itself or some order of the commission, the failure to use such fusible plugs would not be negligence *per se,* but such could be taken into consideration by the jury in determining the ultimate fact and test of negligence under this act, whether or not the boiler was in proper condition and safe to operate in the service to which it was put without unnecessary peril to life or limb. This ruling is applicable here to the claimed failure of defendant to provide a safe and suitable handhold on the rear end of the tender in question. [See, also, 2 Roberts Federal Liabilities of Carriers, sec. 654, p. 1246, sec. 506, p. 1035, and sec. 507, p. 1039; Watkins v. Boston & Maine Railroad (N. H.), 138 Atl. 315; Western & A. Railroad v. Meister (Ga.), 140 S. E. 905, 908; Lehigh Valley Railroad Co. v. Beltz, 10 Fed. (2d) 74.]

When it can be said that Congress or the Interstate Commerce Commission has acted with reference to adequate and proper safety appliances to meet certain conditions, uses and dangers of locomotive tenders and their appliances, and has designated either by the Congressional Act itself or by the rules and orders of the commission what safety appliances are necessary, and the proper construction of same, to meet that situation and use, then neither a court nor jury can be allowed to say that an engine or tender or any appliance constructed and equipped in conformity with the Congressional Act or the rules and orders of the commission, does not comply with the general provision that the engine or tender shall be in proper condition and safe to operate in the service to which same is put. In other words, when the lawmaking power has spoken with reference to a specific status, use or condition and specified what is ''a proper construction and safe to operate,'' then neither a court nor jury can say otherwise under the same or similar conditions or

condemn as unsafe the specified appliance or its construction. Such is the holding in Mahutga v. Minneapolis, St. P. & S. S. M. Ry. Co. (Minn.), 234 N. W. 474, 476, where the court said: "Plaintiff is here attempting to have a jury say that defendant is negligent in failing to install equipment in addition to that required by the Commission. We think this cannot be done. We are of the opinion that, when the carrier complies with the requirements of the Interstate Commerce Commission, as it has done here, and therefore the act of Congress, it cannot be found guilty of actionable negligence because the plaintiff or a jury might think ordinary care required something additional. (Cases cited.)" To the same effect is Central Vermont Ry. Co. v. Perry, 10 Fed. (2d) 132; Erie Railroad Co. v. Lindquist, 27 Fed. (2d) 98; Lancaster & Wight v. Allen (Tex.), 217 S. W. 1032; Auschwitz v. Wabash Ry. Co. (Ill.), 178 N. E. 403, where the court said: "The interests of the carriers will best be served by having and keeping their locomotive boilers safe, and it may well be left to their officers and engineers to decide the engineering questions involved and the means to be used to that end, subject to the rules and specifications of the Interstate Commerce Commission. When the commission has, by order, prescribed rules and specifications in regard thereto, all that is required of the carrier to fulfill its duty in that respect is a strict compliance therewith. These principles are announced as the conclusions of the court after a careful consideration of them, in the case of Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, 69 L. Ed. 419." Here, however, the erection of the "dog house" for the use of the head brakeman changed and put to a different use as to him the rear end of the tender and its appliances and made proper an inquiry as to whether under this new use the tender in question was in fact safe to operate without unnecessary peril to life or limb. The application of the principle of law announced in the cases last cited is a complete answer to the suggestion that the ladder at the rear end of the tender in question would be more safe if there was a loop or handhold extending above the top of the ladder on the left as well as on the right side of same. With reference to this ladder, the Commerce Commission adopted this rule: "A suitable metal end or side-ladder shall be applied to all tanks more than forty-eight inches in height, measured from the top of the end-sill, and securely fastened with bolts or rivets." It is not claimed that this ladder did not fully comply with this rule.

We think that plaintiff's Instruction No. 1 is in line with the construction placed on this act by the Federal courts and that the evidence here is sufficient to warrant the jury in finding that the deceased fell to his death while making his way along the rear portion of the tender or in getting onto the ladder leading to the top of same, and that such fall was due in whole or in part to the fact that "the rear of the tender was not in proper condition and safe to operate in the service to which it was being put and subjected Satter-

lee to unnecessary peril in getting along the rear from the right side and onto the ladder referred to for the purpose of going into the shanty called the 'dog house.' '' In fact, we are impressed with the idea that this tender and its safety appliances was not constructed and equipped with a view to safety with this "dog house" constructed on top of same for the almost constant use of the head brakeman, inviting, if not requiring, him to reach same by mounting the tender while in motion at the right rear corner and then using the narrow sill of the tender as a walkway to reach the ladder leading to the top. As shown by the picture of the tender, the automatic coupling rod extended along there some five inches higher than the rear of the tender sill used as a walkway. Several trainmen as witnesses said that in using this sill as a walkway to the ladder they and others walked on this coupling rod. This was doubtless done because it was thus easier to reach the only available handhold provided. Others, for much the same reason, said they used as a handhold the conduit pipe running along the edge of the roof of the tender carrying the electric light wires from the engine to the bull's-eye light on the rear of the tender, itself an obstruction to the passageway. The bull's-eye electric light was about the height of a man's head at the middle of the end of the tender, standing out several inches from the wall, which more or less obstructed this passageway to the ladder. There were other obstructions more or less serious and which the jury was justified in considering on the question of safety. As originally constructed, the head brakeman's seat was in the cab of the engine with the fireman and it was reached by way of the gangway between the tender and the engine proper and safety appliances were constructed with a view to that use. The handhold and stirrup step at the rear of the tender appear to have been placed there for use in riding the tender in connection with switching, coupling, etc., instead of reaching the brakeman's regular place for riding between stations and when not in active duties. There is much evidence that it was difficult and inconvenient for a man the height of deceased to reach and hold to the handhold on top of same in walking along the narrow sill of the tender. We are convinced that the court was justified by the evidence in submitting the case to the jury on plaintiff's Instruction No. 1 and that such instruction properly declared the law to the jury.

The court also gave to the jury plaintiff's Instruction No. 2 covering the theory that the deceased reached the top of the tender in safety and fell from there to his death, the material part of which reads: ''Or if you find from the evidence that Satterlee got upon the top of the tender, and further find from the evidence that he fell from the top rear portion of the tender of said locomotive, and further find from the evidence that because of the construction, arrangement and equipment and the condition of the top of said tender at said rear portion, and the use to which same was being put, as you

find such to be shown by the evidence herein, subjected the employee to unnecessary peril while using the same in the performance of his duties, and that it was not in proper condition and safe for such use in the service to which the same was being put, then you are instructed that the defendant violated said law in this respect.'' This instruction further required the jury, in order to find for plaintiff, to find that such violation of law caused or helped to cause the deceased to fall from the top of the tender.

As to the construction, arrangement and equipment of the top of the tender, there was first the coal bin next to the engine and extending to and about half the height of the dog house. There was a space of some three feet on either side of the dog house, which was about four feet square and something more than that in height, and there was evidence that some loose coal had fallen from the coal pile into this space. The door or front of the dog house faced to the rear of the tender. Under and back of the dog house was the water tank, the top of which was flat and about ten feet square between the dog house and the rear end. The water intake was two or three feet back of the dog house, slightly higher than the top of the tender, covered and constructed as the law required. By the instruction in question the jury was allowed to find that the ''condition, arrangement and equipment and the condition of the top of the tender at the rear portion'' subjected the deceased to unnecessary peril while using same in the performance of his duties, and that the top of the tender was not in proper condition and safe for such use.

The only evidence supporting the theory that the deceased reached the top of the tender and fell from there to his death is that of the witness Gordon, who testified that he saw the deceased after he reached the top of the tender, where he waved his lantern and started toward the dog house, and that he then had his raincoat. All the evidence is that deceased fell inside and near the west rail of the track, where his body was found severed on the west rail. If he fell from and after reaching the top of the tender, it must have been from the rear end. It seems impossible for him to have fallen from the top on either side to a point between the rails because of the overhang of the tender and he certainly did not fall from the east side. If he was on top of the tender and fell from there, as this instruction assumed, the fact that his lantern was found some fifteen inches back of the top of the ladder on the rear of the tender shows that he fell from near that point. These facts, therefore, eliminate the suggestion that the loose coal in the space or spaces between the dog house and the sides of the tender could have caused deceased's fatal fall, even though allowing the loose coal to be there was in violation of the order of the Commerce Commission that ''top of tender *behind fuel space* shall be kept clean, and means provided to carry off waste water. Suitable covers shall be provided for filling holes.'' These last provisions were concededly complied with. Nor

is there any force in the suggestion that there was a violation of the Boiler Inspection Act in allowing a long clinker hook to be left lying with prongs down along the west or left side of the tender, over which the deceased might have stumbled in the dark. Even if it was possible that deceased stumbled on this clinker hook and fell from the top of the tender, as he must have done, between the tender and the first freight car, as shown by the physical facts, this was due to nothing but the negligent placement or misplacement of the clinker hook and that does not show a violation of the Boiler Inspection Act. [Riley v. Wabash Ry. Co., 328 Mo. 911, 922, 44 S. W. (2d) 136.]

The only other violation of the Boiler Inspection Act relative to the top of the tender urged by plaintiff is that the defendant could have rendered the flat top of the tender more safe and secure by constructing a railing three or four feet high extending around the deck of the tender near the edge, or at least along the rear end, substantially as the existing railing or handhold except high enough to serve both as a barrier to walking or falling off of the top of the tender and a handhold serving the same purpose, or constructing such a handhold of that height running from the dog house along the middle of the tender to the rear end of same. It is conceded that no such barrier or handhold is specifically required by the act itself or any order of the Commerce Commission. There is apparently no more reason for constructing such a barrier or handhold on the flat top of this tender than there would be on any ordinary freight car. It was not shown that any railroad used a tender equipped in this manner. All that plaintiff proved was that such railing or handhold would make the tender more safe to persons walking on the top and that such railing or handhold would be practical and not violate good railroad construction. We think it is apparent, however, that the placing of the dog house on top of the tender, while it rendered the usual method of reaching the top of the tender by way of the rear end of the same more dangerous than by way of the front end of the tender or vestibule of the engine where the head brakeman normally had his seat, yet when the top of the tender was reached in safety, it was no more dangerous to such brakeman in any work he was required to do than if he reached there by climbing over the coal bin, as he would do if his customary seat was in the engine. So far as the top of the tender is concerned, it was just as safe to operate in the service to which it was put, and there was no more unnecessary peril to life or limb, than if the deceased had reached the top of the tender by way of the front end. We fail to see, therefore, how the construction of the dog house on the top of the tender for the use of the brakeman while not engaged in his active duties afforded any basis for the jury to find that "the construction, arrangement and equipment and the condition of the top of the tender at said rear portion, and the use to which same was being put"

subjected the employee to unnecessary peril while using same in the performance of his duties, or caused the top of the tender not to be "in proper condition and safe for such use in the service to which same was being put." With the exception of placing the dog house thereon, the top of the tender was of standard and customary make, built and equipped the same as all other engines in use on this and other railroads and complied with all the requirements and orders of the Commerce Commission. In rejecting and striking out some of defendant's evidence to this effect the court was in error, but such facts clearly appear. The court also went too far in giving Instruction No. 4 for plaintiff telling the jury in effect not to consider for any purpose any of the evidence tending to show that the locomotive and tender in question was manufactured by a large standard builder of locomotives used by railroads generally. This instruction was too board and excluded evidence proper for the jury's consideration. [Ford v. McAdoo (N. Y.), 131 N. E. 874, 876 (certiorari denied, 257 U. S. 641).]

For the error in submitting the case on plaintiff's Instruction No. 2, the judgment is reversed and the cause remanded. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.