ANNA J. MULLEN, Administratrix of the Estate of BURT MULLEN, Appellant, v. FRANK O. LOWDEN, JAMES E. GORMAN and JOSEPH B. FLEMING, Trustees for the Chicago, Rock Island & Pacific Railway Company, a Corporation.—124 S. W. (2d) 1152.

Division One, February 8, 1939.

*Wendell W. McCanles, Earl H. Bowles* and *W. H. Hargus* for appellant.

42

*Hogsett, Murray, Depping & Houts* for respondents.

HYDE, C.—This is an action, under the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59) for damages for the death of Burt Mullen, husband of plaintiff. Mullen was found dead in defendants' yards at Belleville, Kansas, after the train on which he was riding as head brakeman had left that terminal. Plaintiff obtained a verdict for $10,000. Thereafter, the trial court sustained defendants' motion for new trial on the ground "that there was insufficient evidence" to make a jury case. Plaintiff has appealed from this order granting a new trial.

Since the sole question is whether plaintiff was entitled to go to the jury, we will consider the evidence most favorable to plaintiff's contentions. The charges of negligence made in the petition included: (1) Permitting Mullen to go on the train when defendants' employees knew or could have known that he was not in physical condition to do so; (2) starting the train upon a signal from the rear brakeman without a signal from Mullen; (3) permitting the train to proceed after passing from the switch to the main line upon

a signal from the rear brakeman without a repeat or answer signal from Mullen; (4) failure to stop the train when the signal from the rear brakeman was not repeated or answered by Mullen; (5) causing the speed of the train to be suddenly checked and then suddenly increased jarring, jerking, and shaking the tender upon which Mullen was riding. The case was submitted on a combination of charges 3 and 4 only, but an instruction attempting to submit charge 5 was offered and refused. There was no attempt to submit charges 1 and 2, and they were thereby abandoned so far as the consideration of this appeal is concerned.

Plaintiff produced as witnesses all of the living members (the fireman had died) of the train crew upon which Mullen was head brakeman. Therefore, all evidence as to actual facts occurring on the night of his death (July 30, 1935) came into the case as plaintiff's evidence. Defendant's evidence concerned only the construction and application of defendants' rules about signaling. Mullen, who had been in railroad service for eighteen years, and the other members of the train crew operated freight trains between Belleville and McFarland, Kansas. Mullen lived at McFarland and slept in the caboose when in Belleville. The other members of the crew lived in Belleville. The main line track, known as the "Kansas main," ended at the Belleville depot. There was another main line track through Belleville, just north of the "Kansas main," known as the "Colorado-Nebraska main." There were two switch yards at Belleville, the west yards, where the roundhouse was located, were near the depot, and the smaller east yards were several hundred feet east at the east edge of the city. The tracks ran downgrade between the two yards and started upgrade somewhere beyond the east yard lead switch.

Mullen arrived with his crew at Belleville from McFarland about midnight, July 29. They were called for 9:45 P. M. on July 30 to leave at 10:00 P. M. with another train for McFarland. This train consisted of thirty-one cars, including the caboose, and was made up prior to 9:45 P. M. in the west yards by a switching crew. It was composed mostly of tank cars except for five loaded gravel cars at the front and a few empty box cars. This train made up on a track called the scale track, which was on the south side of the "Kansas main," with the caboose at the depot. The conductor and rear brakeman came to the caboose a little before 9:45 P. M. and noticed Mullen's bed had not been made up and Mullen was not there. It was Mullen's duty as head brakeman to go for the engine at the roundhouse, pilot it through the switches, and couple it to the train. Since Mullen was not on hand, the rear brakeman performed this duty. When the engine was coupled, it extended beyond the scale track switch on to the "Kansas main." In the meantime, the conductor made a list of the cars. When the conductor and rear brakeman got back to the caboose they found that Mullen's bed had been made up.

It was past time to leave, and the conductor sent the rear brakeman to the engine to see if Mullen was there. When he got to the engine, he saw Mullen coming from the east carrying a large carbide can, which he used for a seat on top of the tender, a burlap sack, which he used for a cushion, his lantern and his dinner bucket. He then turned around and gave the conductor the signal with his lantern that Mullen was there. The conductor answered by giving a "proceed" signal. Mullen got on the tender and put his things there. His regular position was in the engine cab where he had a seat in front of the fireman's seat. However, it was very hot weather and he chose to ride outside for his own comfort.

The rear brakeman then saw Mullen get off the tender and walk toward him. The rear brakeman said "come on Burt, highball it, let's go." Mullen mumbled something the rear brakeman did not hear, turned around, walked back, and got on the tender. The rear brakeman gave a "proceed" signal to the engineer, who answered with two blasts of the whistle and started the train. The engineer saw Mullen get back on the tender just before he started. It was then about 10:20 P. M. When the engine had moved about ten car-lengths and was crossing the roundhouse switch (the next switch east of the scale track switch and the last switch in the west yards) he looked back and saw Mullen's lighted lantern, on the tender, in a position about where it would be if held in a man's hand. No one ever saw him on the train after that and he was found dead about midnight (with his burlap sack in one hand and his unlighted lantern in the other) beyond the first (west) switch of the east yards at a point about 1360 feet west of the scale track switch. His body was between the "Kansas main" and the north switch track. The coroner testified that his body had not been dragged and that there was a cut behind his ear which was the cause of his death, in his opinion.

In pulling out onto the "Kansas main" from the scale track, the train got up a speed of seven or eight miles per hour but then slowed down and was "drifting" about four to five miles per hour when the rear end was pulled out onto the main line. "Drifting" downgrade caused the slack in the couplings to bunch against the engine. The rear brakeman was waiting on the ground at the scale track switch to close the switch, when the caboose cleared it. The engineer said he saw the switch light turn from red to green, indicating the switch was closed. After closing it, the rear brakeman ran and caught the caboose. He then gave a "proceed," "highball" signal with his lantern from the caboose steps. The engineer saw this and answered with two blasts of the whistle, increased speed, and proceeded out of town. The engineer said that at the time, he got this final "highball," the engine had reached the tool house, which was 350 feet east of the east yard lead switch. Mullen's body was found 150 feet west of the tool house.

Plaintiff's theory, submitted, was that "there was a rule, custom and practice at said time and place well known to the defendants' employees, including the deceased, operating said train, for the head brakeman on leaving Belleville, Kansas, to assume a position on the engine or near the front of said train so that he could see the engineer and rear brakeman and be seen by them in taking and transmitting signals and if the head brakeman was not in such a position as aforesaid where he could see and be seen and if he did not give a repeat signal to the proceed signal given by the rear brakeman to then, and there stop the train and ascertain the whereabouts of the head brakeman;" and that it was negligence to proceed out of town, instead of stopping the train, when the rear brakeman's final "highball" from the caboose steps, was not answered by and repeated to the engineer by the head brakeman from the tender. Plaintiff had evidence to the effect that the engineer "is not supposed to start until everyone has signaled they are ready." One witness testified: "Q. Assuming the train is moving and the rear man gives a highball, what is the custom and practice on the part of the head man? A. Why he would repeat it. Q. What is the purpose of that repeat, what does it say to the engineer and other members of the crew? A. He says that it is all right at the head end and at the same time he answers the signal from the rear end. Q. What do you mean, 'it is all right at the head end? A. That portion of the train is ready and he is ready.'" Another witness testified: "Q. Assume the train is moving and has been moving slowly, and a signal is given to proceed and there is no repeat signal and the lantern and the man is not seen at that time, what should the engineer do? A. That is a stop signal. Q. What do you mean by that? A. That means that the book of rules, the standard book of rules, states in the absence of signals, or signals to be seen, that is a stop signal and they must not proceed." Other witnesses for plaintiff gave similar testimony. Defendants' witnesses testified that, when a train was already moving out of a terminal the engineer customarily and properly took the final "highball" signal direct from the rear brakeman after he had closed a switch and caught the moving train; and that it was not customary or required for him to look for or get any further signal from anyone else under those circumstances.

Whatever rule or custom applied to signals in starting the train is immaterial because Mullen was on the tender when the train started and was not injured by its start. The place where he was found was between the tool house (1510 feet from the scale track switch) and the east yard lead switch (1060 feet from the scale track switch); and the body was located as 150 feet west of the tool house which would be 1360 feet west of the scale track switch. The evidence does not show where the up grade started with reference to the yard

switch or tool house. Plaintiff's argument is that, since the engineer estimated the length of the train as from 900 to 1200 feet, the tender had not yet reached the point, where Mullen's body was found, when the engineer increased speed after the rear brakeman closed the switch and signaled from the caboose. Plaintiff also argues this matter from average lengths of cars (about 40 feet) but this leaves out an estimated two feet for couplings between cars and the distance the caboose had traveled, before the rear brakeman caught it after closing the switch, and also the length of the engine, tender and caboose. However, the engineer definitely placed the engine at or just beyond (east of) the tool house when he received the rear brakeman's final highball from the caboose and began to increase speed. No one else claimed to know where the engine was at that time. Both the indefinite position of the engine (when speed was increased) based on the estimate of the length of the train, and the definite position, fixed with reference to the tool house, came into the case as a part of plaintiff's evidence. Certainly in this situation, in determining whether there was substantial evidence in favor of plaintiff's theory, the definite must prevail over the indefinite. [Penna. Railroad Co. v. Chamberlain, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819; Southern Railroad Co. v. Walters, 284 U. S. 190, 52 Sup. Ct. 58, 76 L. Ed. 239; C., M. & St. P. Railroad Co. v. Coogan, 271 U. S. 472, 46 Sup. Ct. 564, 70 L. Ed. 1041.] Therefore, plaintiff is without any substantial evidence to show that Mullen fell off the train *after* the final highball signal was given and this leaves the whole matter in the realm of speculation and conjecture only.

However, even if it be conceded that Mullen fell off after this signal was given, plaintiff still failed to make a case either on the theory (failure to stop) submitted, or on the theory (causing a jerk) which the court refused to submit. As to the latter it is only necessary to say that the positive evidence of plaintiff's witnesses was that the train was smoothly handled and that there was no unusual jerk or jar. Some of plaintiff's experts testified (on hypothetical questions) that such a train (with five gravel cars behind the tender) under the circumstances shown (drifting downgrade at five miles per hour) could not be caused to increase speed on an upgrade without jarring and jerking, and said that "it will happen every time." But this could only mean that the jars resulting would be those of usual and ordinary handling of the train. Of course, that does not show negligence. Furthermore, under the Federal Employers' Liability Act, assumption of risk is a defense and trainmen assume the risk of usual and ordinary handling of the train. [For discussion of Federal rule of assumption of risk see Webber v. Terminal Railroad Assn., 335 Mo. 11, 70 S. W. (2d) 863; see, also, Wheelock v. Freiwald (U. S. C. A.), 66 Fed. (2d) 694, and cases cited.] Especially would this be

true of a trainman who had a place of safety provided for him (in the engine cab) but rode in a more dangerous place (on the tender) as a matter of his own choice.

■ As to failure to stop the train, there is no substantial evidence to show that failure to stop was the proximate cause of Mullen's death. That is, there is nothing in the evidence to show either that increasing speed in the usual way or failure to stop caused him to fall off the tender. There is no evidence to show where he was or what he was doing at any time after the engine crossed the roundhouse switch. The train had continued in motion up to the time when the final highball signal was given from the caboose, as it had never stopped, from the time it started from the scale track, where Mullen got on the tender. It is wholly a matter of speculation and conjecture on this record as to whether either stopping or going on would have increased or decreased the danger of Mullen's position, whatever it was. Certainly to stop (which would also necessarily cause some jar) when Mullen had given no signal to stop, and might not have expected a stop, could have increased it. How going on, without an unusual jerk or jar, could have caused an experienced brakeman to fall off the tender is difficult to understand, especially when the engine whistle was sounded twice before speed was increased. [For a case holding against liability for head brakeman falling off the top of a tender even under the Federal Boiler Inspection Act, see Satterlee v. St. L.-S. F. Railway Co., 336 Mo. 943, 82 S. W. (2d) 69.] Anyhow, there were no facts in evidence here to show, or from which any inference could reasonably be drawn, that either failure to stop or increasing speed in the usual manner did cause him to fall. Of course, if the train had never started he would not have fallen from it in the east yards. But showing the train in motion, even if it was increasing speed without unusual jars, merely showed the existence of a condition and did not show an efficient cause of Mullen's death. This is true because there is no evidence whatever to show that he did fall from the train on account of increased speed or that he would not have fallen had the speed remained the same. [See discussion of proximate cause in Cain v. Humes-Deal Co., 329 Mo. 1107, 49 S. W. (2d) 90; Iman v. Freund Bread Co., 332 Mo. 461, 58 S. W. (2d) 477; Robison v. C. & E. I. Railroad Co., 334 Mo. 81, 64 S. W. (2d) 660; Bollinger v. St. L.-S. F. Railroad Co., 334 Mo. 720, 67 S. W. (2d) 985; Carnahan v. M.-K.-T. Railroad Co., 338 Mo. 23, 88 S. W. (2d) 1027; Evans v. Massman Const. Co., 343 Mo. 632, 122 S. W. (2d) 924.] ■ The most that plaintiff's evidence could be said to show is a possibility that increasing speed without Mullen's signal might have contributed to the cause of his fall but, even if that was negligence, "a mere possibility is not a foundation for an inference." [Carnahan v. M.-K.-T. Railroad Co., supra.] We hold that plaintiff failed to make a jury case on causal

connection between the negligence charged (whether considered as increasing speed or failure to stop the train when the head brakeman did not repeat the rear brakeman's highball) and the death of Mullen.

 Defendants ask that this court order a judgment entered in their favor instead of merely affirming the order granting a new trial, citing Cole v. St. L.-S. F. Railroad Co., 332 Mo. 999, 61 S. W. (2d) 344. In the Cole case, this court, on an appeal from an order granting a new trial, directed an order made which the trial court could have made in disposing of the motion; namely, to order a *remittitur* as a condition for overruling the motion. Here defendants are asking this court to direct the trial court to do something that our statutes do not authorize it to do in ruling a motion for a new trial. [Hovey v. Grier, 324 Mo. 634, 23 S. W. (2d) 1058.]

The order granting a new trial is affirmed and the cause remanded. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.