**Frank LINVILLE, et ux.,
Plaintiffs-Respondents,**

v.

**Richard E. WILSON, Administrator of the Estate of William J. Wilson, Deceased, and Silver Moon Lake Corporation, Defendants-Appellants.**

**No. WD32117.**

Missouri Court of Appeals,
Western District.

Feb. 2, 1982.

Daniel M. Czamanske, Riverside, for defendants-appellants.

Don Witt, Witt & Boggs, Platte City, for plaintiffs-respondents.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

DIXON, Judge.

Defendants Richard E. Wilson, Administrator of the estate of William J. Wilson, and Silver Moon Lake Corporation appeal from the trial court's judgment granting plaintiffs Frank Linville, et ux, relief under a petition for mandatory injunction and damages. The court found that the defendants built a dam which caused water to back up on the plaintiffs' adjacent land and ordered that the dam and all obstructions which might cause water to back up be removed. The court further ordered defendants to pay $20,000 in actual damages and $10,000 in punitive damages to plaintiffs. Pursuant to Section 236.270 RSMo 1978 [1], the court found that the actual damages should be doubled.

Defendants have made five allegations of error. They urge that the trial court erred in denying defendants a jury trial, in refusing to admit evidence concerning plaintiffs' failure to mitigate damages, and in applying Section 236.270 RSMo 1978 to the instant case. Plaintiffs further assert error in issuing injunctive relief and in assessing actual damages at $20,000.

The evidence showed that William J. Wilson was the sole shareholder of Silver Moon Lake Corporation and that plaintiffs owned 79 acres contiguous to the northern edge of property owned by the Silver Moon Lake Corporation. A stream runs through the plaintiffs' property from north to south dividing the tract roughly in half. The stream forks in two places on the plaintiffs' property. Before the defendants built a dam across a section of the stream located on their property, there were two places where plaintiffs could cross the branches of the stream to farm the western half of their property, a southern crossing which allowed them access to a 22–23 acre tract and a northern crossing which allowed them access to a 6-acre tract. It was plaintiffs' practice to take heavy farm machinery across the southern crossing. They did not use the northern crossing for that purpose, but there was evidence that they kept the 6-acre tract mowed.

The stream is spring-fed and ran continuously on plaintiffs' property before the dam was built. Prior to the construction of the dam, it was generally 2–3 inches deep and approximately 4–6 feet wide. It was clean and had steep banks at the north end of plaintiffs' property. The stream had a rock bottom, especially at the area where the two crossings were located.

Both parties introduced portions of the deposition of the deceased William J. Wilson taken in June, 1979. Wilson's intention in construction of the dam was to improve the value of his land by building a lake and ultimately subdividing the property and building streets. He started construction of the dam in 1972 or 1973 and in 1973 began filling ditches on his property with trees to stop erosion. The first earthen fill was made in 1976 and the dam first contained water in August, 1978. Wilson denied that he had intended to put water on plaintiffs' land. He conceded that he realized that some water would back up onto plaintiffs' land, but asserted that the maximum water level on plaintiffs' land would be about 30 inches. Wilson informed plaintiffs in 1973 or 1974 that he planned to build a lake on his property. The parties stipulated, however, that plaintiffs did not consent, permit, or direct the construction of the dam.

Plaintiff Frank Linville first discovered problems with his crossings due to the dam in the fall of 1977, but he was not aware of the dam's existence at that time. He noticed in July, 1978, that water was backed up on his property. He estimated that the water covered at least three-fourths of his farm at that time. Plaintiffs' grandson described the creek in December, 1978 as a large body of water, very muddy, and stated that a lot of brush had washed into the creek at that time. Another relative of the plaintiffs viewed the site in June or July of 1979 and described the water as being approximately 100 feet across and about 3 to

---

1. The extensive revision of Chapter 236, broadening statutory control of dams of all descriptions is not involved in the present proceeding, the effective date of that revision being November 1, 1979, after trial of this case.

3½ feet deep in the middle of the southern crossing. There was other testimony that the water was 6–8 feet deep at the crossing after the dam was constructed.

In January, 1979 defendants added a by-pass or elevator to regulate the level of the water of the dam. It was Wilson's opinion that the water level on plaintiffs' land was lowered by two feet at that time. Frank Linville stated that the water was partially let down in August, 1979. He did not determine at that time what defendants used to lower the water level, but stated that Wilson had planned to do so by digging a ditch across the south of his field. Within ten days of the trial, which took place in June, 1980, defendants broke the dam and drained the lake. When the water level was lowered in August, 1979, mud filled up both sides of plaintiffs' crossing, and left at least 5 feet of mud in the center. At the time of trial, the stream was filled with mud.

John Lutjen, a civil engineer, studied the plaintiffs' property to determine the effects of the dam. In March, 1980 he found 8 feet of water backed up on the southern end of their property. He observed an 18-inch tube in the dam which allowed some of the water which might have gone over the spillway to drain into a ditch which ran west and drained into a larger culvert. The tube was too small, however, to significantly change the height of the water in the lake during a heavy rainfall. On his second visit, the dam and spillway remained, with a ditch running off to the west, but the 18-inch tube had been removed. From photographs taken of the site after the dam had been cut, Lutjen determined that a large number of trees had been pushed into what was the channel of the creek and had trapped silt, effectively eliminating the old stream bed. As a result, the flow of water will be restricted and eventually the water on plaintiffs' property will be a foot deeper than it would be if the trees were not there. He agreed, however, that with a 35-foot hole in the dam and the lake drained, there would not be a permanent impoundment of water. He further agreed that it was possible that heavy rains might have eventually cut the ditches deeper by erosion, causing the crossing to become impassable.

Plaintiffs were able to harvest their 1977 crops, but have not been able to use the crossings since that time to plant a crop because of the mud. Plaintiffs have lived there for 38 years and had always been able to use the southern crossing.

There was some evidence that plaintiffs' net income from the crops in previous years was approximately $80 to $100 per acre. Defendants' witness, however, estimated only $1,300 to $1,400 crop loss per year. In recent years, plaintiffs had used the 6-acre section across from the northern crossing to participate in a government program and did not plant crops on that section; however, they did keep it mowed, as required by the government.

John Lutjen, the civil engineer, calculated that the cost of removing the mud from plaintiffs' property was $51,400 and that it would cost $11,400 to repair the two crossings. His figure was based on the cost of building a 30-foot crossing, as he thought mud would probably ooze back in, resulting in a 20-foot crossing. He agreed that if the crossings were constructed to be 15 feet wide, that the costs of repair would be cut roughly in half, to $5,700. He stated that a certain amount of the mud on plaintiffs' land would wash away because of natural erosion, but that it would take many years for the ground to dry itself out.

Don Humes, an excavator, testified for the defendants that it would cost a total of $3,900 to remove the mud and repair both crossings. He based his estimate of the repair costs, however, on the construction of crossings which he admitted might eventually be washed out by the mud and surface water. Robert Selvias, a real estate appraiser, testified for the defendants that it would cost $2,500 to $2,600 to repair both crossings.

Bart Owens, a real estate broker, estimated that the fair market value of plaintiffs' land prior to the construction of the dam was $79,000 ($1,000 per acre) and in its present condition was $51,000. Frank Lin-

ville stated that prior to the construction of the dam, his land had a fair market value of $94,800 and in its present condition was worth one-half that figure. Wilson stated that his land had a potential value of $35,000 per acre, with streets, and that plaintiffs' property might be worth $3,000 to $4,000 per acre if there were enough water on his land to be beneficial to it. Robert Selvias, a real estate appraiser, testified for defendants that prior to the construction of the dam plaintiffs' property was worth $74,000 and that it was presently worth $70,000.

Considering first the defendants' claim that the evidence was insufficient to support the award of damages, actual and punitive, it is sufficient to say that under the applicable standard of review, Rule 73.01(c), explicated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), the evidence is sufficient to support the judgment. Counsel candidly admitted as much in the oral argument.

■ Nor is there any merit to the claim regarding the exclusion of evidence concerning mitigation of damages. The only offer of proof regarding evidence of mitigation shows that the plaintiffs made at least some effort to rent the crop land to a tenant who might have had access to the land. Absent an offer of proof that demonstrates relevant and admissible evidence was excluded, no error is demonstrated.

■ Defendants have also briefed a point concerning the issuance of the injunction. The contention is that whatever conduct of the defendants which might have been subject to injunction had ceased at the time of trial because the dam had been cut ten days before trial. Plaintiffs counter by pointing out the fact that the abatement of the continued clogging of the watercourse by debris is also part of the injunctive relief afforded. Thus, even if the dam were no longer impounding water, the injunctive relief was mandatory and continuing as to the blockage of the watercourse. There was a sufficient showing that the acts enjoined might continue to recur to justify the injunctive relief granted. *Missouri National Life Insurance Company v. Executive Agencies, Inc.*, 514 S.W.2d 182, 183 (Mo. App.1974).

■ Defendants vigorously assert that they were improperly denied a trial by jury. The crux of this argument is a forthright attack upon the doctrine of "equitable cleanup." The trial court denied a jury trial under the recognized rule that, when equitable jurisdiction attaches, the court may determine the legal issues incident to the entire case. Defendants rely on two federal cases, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), which interpret the Federal Rule of Civil Procedure 38 as eliminating the doctrine of "equitable cleanup." Defendants say Federal Rule 38 is identical to Missouri Rule 69.01 and that a similar interpretation should be made. The difficulty with the argument is that the latest controlling authority is to the contrary on the issue of a right to jury trial when equitable jurisdiction has attached. *State ex rel. Willman v. Sloan*, 574 S.W.2d 421 (Mo. banc 1978). The *Willman* case recognizes, applies, and affirms the doctrine of "equitable cleanup" and is controlling.

Finally, defendants contend that the trial court erred in doubling the actual damages pursuant to § 236.270 RSMo 1978.

Chapter 236 RSMo 1978 has been uniformly interpreted, as its title and plain language suggests, to have a limited application to dams utilized for mill purposes. *State ex rel. Tibbels v. Iden*, 221 S.W. 781 (Mo.App.1920). Even more restrictive of the application of Chapter 236 RSMo 1978 is the case of *Southwest Missouri Light Co. v. Scheurich*, 174 Mo. 235, 73 S.W. 496 (1903), in which the Supreme Court unequivocally restricted the operation of the chapter to "grist mills." The holding of that case was adhered to in later litigation between the same parties in *Scheurich v. Southwest Missouri Light Co.*, 109 Mo.App. 406, 84 S.W. 1003 (1905). In this latter litigation, the trial court awarded double damages, a judgment which the defendant did not ap-

peal and which was not there in issue. The plaintiff appealed, claiming only that the dam in question should be enjoined. The plaintiff was awarded injunctive relief on appeal. The proceeding in the prior case was pled as a defense to the injunction. Essential to the holding of the court decreeing injunctive relief was the finding that the statute on mill dams afforded no defense.

██ The language of Section 236.270 is:

236.270. Penalty for building without permission.—Any person who shall build or heighten any dam, or any other stoppage or obstruction on or across any watercourse, without first obtaining permission from the court of the proper county, according to law, and shall thereby work any injury to any other person, shall forfeit to the party injured double damages for such injury, to be recovered by civil action.

The plain requirement of this language is that it applies only to those cases in which permission to erect such a dam could have been obtained but was not.

In the instant case, no such permission could be obtained for the dam in question and the double damage portion of the chapter, § 236.270 RSMo 1978, does not apply.

No case has been cited and none has been found applying the statute to facts similar to the instant case. The judgment is affirmed except as to the doubling of the actual damages. That portion of the judgment may not stand. The judgment, as modified, is affirmed.

All concur.