**Frances Nadine TURNER, Appellant,**

v.

**FUQUA HOMES, INC. and Ruby Pitts d/b/a Pitts Mobile Homes, Respondents.**

**No. WD 38877.**

Missouri Court of Appeals, Western District.

Dec. 22, 1987.

Michael C. McCormick, Lee's Summit, Barry W. McCormick, of Payne & Jones, Chartered, Overland Park, Kan., for appellant.

Thomas O. Baker, Evan A. Douthit, & R. Douglas Gentile of Baker & Sterchi, Kansas City, for Fuqua Homes.

Larry J. Tyrl, of James, Millert, Houdek, Tyrl & Sommers, Kansas City, for Ruby Pitts dba Pitts Mobile Homes.

Before CLARK, P.J., and TURNAGE and MANFORD, JJ.

MANFORD, Judge.

Appellant (plaintiff below) appeals from a judgment entered pursuant to a jury verdict in favor of respondents (defendants below) on appellant's petition for damages for wrongful death and personal injuries.

Appellant's petition alleges that the mobile home manufactured by respondent Fuqua Homes, Inc., and sold by respondent Ruby Pitts, d/b/a Pitts Mobile Homes, did not have a flue (or roof jack) which would allow the furnace gases to vent outside the home. Appellant alleges that such condition caused gases, consisting of lethal levels of carbon monoxide, to circulate within the home, thereby resulting in decedent's death and appellant's personal injuries.

Appellant raises seven points on appeal and charges that the trial court erred (1) in overruling appellant's objection to allowing respondents to call as respondents' own witnesses appellant's consulting experts; (2) in sustaining respondents' motion in limine prohibiting appellant from calling an expert witness; (3) in overruling appellant's objection to testimony of respondents' expert witnesses; (4) in sustaining respondents' objection to testimony of appellant's expert witness and testimony of respondent Fuqua Homes, Inc. concerning their knowledge of federal regulations; (5) in sustaining respondents' objections to evidence of prior incidents of alleged negligence; (6) in sustaining respondents' objection to the admission of an amended death certificate; and (7) in failing to sua sponte admonish respondents counsel for improper, abusive and inflammatory remarks during trial.

The incident in question resulted in a two-week long trial which consisted of convoluted and contradicted testimony from numerous fact witnesses as well as expert witnesses. Appellant's brief contains a Statement of Facts which is grossly one-sided and argumentative and which ignores virtually all evidence in favor of respondents. This court reminds appellant of Rule 84.04(c), which states:

The statement of facts shall be a *fair and concise* statement of the facts relevant to the questions presented for determination *without argument*. Such statement of facts may be followed by a resume of the testimony of each witness relevant to the points presented. (Emphasis added.)

Furthermore, this court notes that appellant's argument portion of her brief fails in great part to cite page references to the transcript and legal file where referencing facts from those sources. Again, appellant is reminded of Rule 84.04(h), which requires that such page references be noted.

This court summarizes the evidence as follows:

Appellant, Frances Nadine Turner, and decedent, Shelby H. Turner, were married on January 22, 1980. During the marriage, there were numerous periods of separation, some lasting as long as ten months. On August 14, 1984, appellant and decedent purchased a mobile home from respondent, Ruby Pitts, d/b/a Pitts Mobile Homes, located in Independence, Missouri, and arranged to have the home delivered and set up at Northland Mobile Home Park, in Kansas City, Missouri. The mobile home, which was purchased as new, had been manufactured by respondent, Fuqua Homes, Inc., in Boonville, Missouri.

After living in the mobile home for several weeks, appellant and decedent separated once again. (The reason for this separation, as well as others, was in part due to decedent's chronic alcoholism.) Appellant moved to Phoenix, Arizona, where she obtained an apartment and found employment selling mobile homes. Appellant returned

to Kansas City on or about October 27, 1984. There was controverted evidence as to appellant's reason for returning to Kansas City (appellant claiming a reconciliation; respondents claiming appellant returned for financial reasons), however, such is not relevant to any of appellant's points on appeal, therefore such evidence is excluded herein. .

Appellant testified that shortly after returning to Kansas City and four days prior to decedent's death, she went to a Dr. Meyers, complaining of dizziness, headaches and left-sided numbness (which only occurred on October 29th). Appellant did not complain of nausea or vomiting. Dr. Meyer noted that her symptoms indicated a possible transient ischemic attack (a temporary lack of oxygen to an organ, e.g., the brain). Dr. Meyers also indicated the possibility of diabetes, hypertension, hypokalemia (low potassium), anxiety and irritable bowel. Prior to her visit to Dr. Meyers, appellant had been treated for several years by Dr. Meyers' partner, Dr. Cashier. Since October, 1979, Dr. Cashier had treated appellant for a number of chronic illnesses including hypertension, obesity, anxiety, cholecystitis (inflammation of the gall bladder), adult onset diabetes, chronic diarrhea, and occasional hypokalemia. During this period, Dr. Cashier prescribed numerous medications for appellant including Triavil (an antidepressant). Dr. Cashier testified that appellant's left-sided numbness for just one day, coupled with her other complaints, would be consistent with a transient ischemic attack.

Appellant underwent a number of tests on November 1, 1984, which revealed no problems within her carotid arteries (the blood vessels in the neck), but did reveal that appellant was suffering from hyperlipidemia (elevated levels of fat in the blood),

and an elevated glucose level. Appellant returned to Dr. Cashier's office on November 3rd (two days before decedent's death) and consulted a nurse practitioner dietician. At that time, her earlier symptoms had subsided except for the headaches.

The evidence indicated that decedent also had a history of medical problems which were either caused by or complicated by decedent's alcoholism and addiction to cigarettes (two to three packs a day). Among these problems were alcoholic hepatitis, gynecomastia (an enlargement of the breast of a male caused by increased levels of female hormones, a condition common among alcoholics), and heart disease. Decedent's history included complaints of sharp chest pain, and the sensation that his heart raced and sometimes skipped a beat. A Mr. Hoedl, a "drinking buddy" of decedent's, testified that decedent complained of chest pains in the late summer and early fall of 1984, and that decedent told him (Hoedl) that he was having chest pains the week before he died.

Appellant testified that on the evening of November 4, 1984, she and decedent watched a movie on television and went to bed around 10:30 p.m.[1] She stated that sometime during the night, she heard decedent fall in the bathroom. When appellant went to investigate, she found decedent thrashing about on the bathroom floor screaming. Appellant testified that everything turned bright and green and she fell to the floor. She stated that she regained consciousness at approximately 7:45 p.m., November 5th, and that she dragged herself into the bedroom and called 911.

When paramedics arrived, appellant answered the door.[2] The paramedics found decedent on the bathroom floor. The body was cold and ashen grey in color (as op-

---

1. There was evidence indicating that appellant might not have been at the mobile home on the day of decedent's death, but again such evidence is excluded herein as not pertinent to the points on appeal.

2. Several emergency personnel on this scene testified that appellant was neat and clean in appearance and was not confused or disoriented. Upon examination, they concluded she

did not need medical attention, but appellant was transported to the hospital upon her insistence. On the other hand, appellant's son and daughter, who arrived shortly after the paramedics, testified that appellant was disheveled in appearance, and had feces and vomit on her hair and body. They further stated her speech was slurred and that she was confused and disoriented.

posed to the cherry red color which is common of asphyxiation by carbon monoxide.) The paramedics concluded that decedent had been dead for some time. The evidence indicates that decedent had telephoned his supervisor at TWA at approximately 7:45 a.m. on November 5, 1984, and reported that he would not be at work and stated that he had had "a heart attack or something" during the night.

Decedent's body was examined, at the scene, by a police officer who received a phone call from Richard Mreen at the Clay County Coroner's office. Mreen did not go to the residence, but obtained information from appellant through the police officer. Appellant related to Mreen that decedent's death was not expected, but that he did have past heart problems.

Pursuant to the coroner's procedures, the information Mreen received from appellant was turned over to Dr. Vescovo, the Clay County coroner. The official cause of death on the original death certificate was listed as "natural causes". Decedent's body was transported to Vaughn's Funeral Home, where it was embalmed by Mr. L.R. Vaughn. No autopsy was performed prior to embalming. Vaughn testified that the body looked "normal" and was ashen grey in color. Vaughn embalmed decedent's body using a reddish dye known as Vitahue, which gives the corpse a flesh-tone color.

Appellant was transported to Spelman Memorial Hospital. She received a small amount of oxygen in the ambulance, but no other medication. In the emergency room, she was attended by Dr. Paula Nauer, who could not find anything specific to require hospitalization. Dr. Nauer's E.R. note indicated that appellant possibly suffered a transient ischemic attack or myocardial infarction (heart attack). The E.R. note indicated that appellant denied headache, injury or loss of consciousness, however, Dr. Nauer did note that appellant had feces and vomit in her hair, although during her testimony, Dr. Nauer had no recollection of this.

The patient assessment sheet (which was filled out by a nurse) indicated that appellant was oriented and not confused and was able to walk in a steady manner. Appellant did exhibit evidence of sinus tachycardia (a heart rhythm disturbance), so Dr. Nauer admitted her for observation and further evaluation for possible transient ischemic attack or myocardial infarction.

After her admission, appellant was examined on November 6th by Dr. Cashier. At that time, appellant complained of left-sided headaches for the past two weeks. Dr. Cashier's initial impression was to rule out a cerebrovascular accident (stroke) and myocardial infarction. There was no mention of carbon monoxide poisoning anywhere in appellant's progress notes. Dr. Cashier did, however, suspect ischemia and coronary artery disease. At the time of appellant's discharge on November 10, 1984, Dr. Cashier had not been able to rule out transient ischemic attack.

On November 12, 1984, appellant called Ruby Pitts to report that she could not keep the pilot light on the furnace lit. On the same day, a repairman by the name of Bill Harvey [3] was sent to investigate the problem. Harvey said that he first examined the furnace to see if it was properly set. Harvey found the furnace to be properly set for natural gas and he specifically determined that the pressure regulating valve was set on "NAT" (for natural gas).

Harvey went to the roof to check the roof jack, because a plugged roof jack will cause the pilot to go out. He then determined that there was no roof jack, but that a hole had been cut in the roof for one and had been covered with duct tape and a coat of sealant applied. He then went into the home, removed a panel over the furnace and looked up into the cavity. He found no roof jack. He also noticed that there was no soot in the cavity above the furnace where the roof jack should be.

---

**3.** Bill Harvey was a furnace repairman with 25 years experience working on mobile home furnaces.

Appellant contacted an attorney on November 13, 1984, and on the 16th, the attorney and an engineering expert, John Sims, arrived at the home to conduct an inspection. Sims testified that on that day, the furnace pressure regulator was set in the LP position (for liquified petroleum gas). Sims also found that there was no roof jack and he recommended that the furnace be tested for carbon monoxide production.

Appellant then retained Midwest Research Institute (MRI) to assist in the testing. On November 27, 1984, Sims returned to the home with appellant's attorney and a Mr. Chris Cole from MRI to test the furnace. Sims operated the furnace while Cole ran the monitoring equipment which evaluated the air for carbon monoxide. They ran two tests (both in the LP setting) and detected carbon monoxide levels of 2200 parts per million (p.p.m.) and 500 p.p.m. respectively. Cole testified that the pilot had to be relit at the beginning of the second test. Both Cole and Sims testified that while the tests were being conducted, with the pressure regulator set for LP, the home was filled with a noxious gas which burned and watered the eyes and nose, tasted bad and had an offensive odor.

On December 3, 1984, respondents retained consulting engineers Scott Bayles and Robert Bayles to inspect the home. Photographs and notes were taken during the inspection but no tests were run.

On December 8, 1984, Mr. Harvey returned to the home and installed a roof jack and changed the gas pressure regulator to the "NAT" position. On February 20, 1985, this lawsuit was filed in Jackson County Circuit Court.

On May 29, 1985, decedent's body was exhumed and an autopsy was jointly conducted by appellant's pathologist, Dr. James Bridgens, and respondent's pathologist, Dr. Thomas Fritzlen. Both pathologists simultaneously examined the body, all major organs, and conducted a complete autopsy. The embalming process had preserved the body and there was essentially no decomposition. Both pathologists removed tissue and blood samples which were taken to their respective laboratories for microscopic examination. Upon microscopic examination, each pathologist found pulmonary congestion, fatty deposits in the liver and cirrhosis of the liver. Although Dr. Bridgens found nothing unusual in the heart, Dr. Fritzlen found occlusion (blockage) of various coronary arteries between 50% occluded and 83% occluded. Based upon the autopsy (and the toxicological reports), Dr. Fritzlen concluded that decedent died from coronary artherosclerosis (coronary artery disease) via the mechanism of cardiac arrest. Dr. Bridgens, however, testified that it was his opinion that decedent died from carbon monoxide poisoning. When cross-examined, Dr. Bridgens testified that the basis of his opinion was the circumstances of the "simultaneous collapse" of both decedent and appellant. Dr. Bridgens further admitted that he had formed this opinion prior to the autopsy.

Dr. Fritzlen sent microscopic slides he had made of decedent's tissues to a Dr. Frank Mantz, a pathologist, for examination. Dr. Mantz found "massive" artherosclerosis and, based upon his review of the slides, concluded that decedent had died from cardiac arrhythmia induced by a very significant degree of localized coronary artherosclerosis.

Following the autopsy, both Drs. Bridgens and Fritzlen sent tissue samples to toxicologists for examination for presence of carbon monoxide. Dr. Fritzlen sent a first set of tissue samples (consisting of a blood clot) to a Dr. Charles Winek, the chief forensic toxicologist for the coroner's office in Allegheny County, Pennsylvania. Dr. Bridgens sent his samples to a Dr. Charles Johnson, a toxicologist at the University of Missouri in Columbia.

Dr. Winek did not detect carbon monoxide levels above 5% in any of the samples sent. In order to verify these results, Dr. Fritzlen sent to Dr. Winek a second set of tissue samples (this time from various organs). Again, Dr. Winek did not detect carbon monoxide above 5%.

Dr. Johnson also tested the samples and found toxicologically insignificant levels of carbon monoxide (approximately 12%). Dr. Johnson testified that carbon monoxide is

present in the tissue of all people and that a three-pack-a-day smoker might have levels as high as 15%. When Dr. Johnson informed Dr. Bridgens of the test results, Dr. Bridgens told him that his test results must be invalid and to "keep looking for carbon monoxide." As requested, Dr. Johnson ran another test, this time using a tissue sample from the heart. Again, he obtained toxicologically insignificant levels of carbon monoxide. Dr. Johnson testified that when he reported the results of the second test, Dr. Bridgens attacked his "integrity".

After Dr. Johnson had talked with Dr. Bridgens, he felt that he needed to verify his test results, for his own benefit. On his own volition, and without informing Dr. Bridgens, appellant's counsel, or anyone else affiliated with appellant, Dr. Johnson sent some of the untested tissue samples to a colleague at the FAA Toxicology Lab in Oklahoma City, Oklahoma. Dr. Johnson's colleague, Dr. Delbert Lacefield, utilizing different but still widely accepted scientific testing methods using "state-of-the-art" equipment, tested the samples he received from Dr. Johnson and found toxicologically insignificant levels (9%) of carbon monoxide.

When Dr. Johnson received Dr. Lacefield's test results, he telephoned Dr. Bridgens and informed him of said results. Dr. Bridgens did not ask Dr. Johnson to conduct further tests but instead he requested that Dr. Johnson send the tissue samples to a Dr. Garriott, a toxicologist in San Antonio, Texas.

Dr. Garriott tested the samples he received from Dr. Johnson using a generally scientifically accepted test procedure and obtained negative results (insignificant levels of carbon monoxide) after the standard two-hour reaction time. Dr. Garriott then decided to modify the test procedure by expanding the reaction time to seventy-two hours. He concluded, upon this modified testing procedure, that the tissue samples were "positive" for carbon monoxide and, in his opinion, exceeded levels of 55–60%.

On February 24, 1986, expert witnesses Mel Winters, Milo Dudden and Jordan Heiman examined and tested the furnace on behalf of respondents. Prior to testing, the roof jack had to be removed and the hole sealed in order to create the same conditions that existed on November 5, 1984. Dudden removed the roof jack and sealed the hole with enough layers of duct tape, crisscrossed back and forth, to assure that it was a tight closure. In preparation, Winters and Dudden reviewed photographs of the home and furnace taken in November of 1984 by appellant's experts to assure that the home and furnace were in the same or substantially similar condition as they had been in early November, 1984.

Mr. Dudden then ran four tests in the home. In the first and second test, the furnace gas pressure regulator was set in the "NAT" position. During these tests, harmless levels of carbon monoxide were recorded (30–55 p.p.m. and 45–80 p.p.m., respectively). The third test was run with the pressure regulator set for "LP". The carbon monoxide detected during the third test was 320–460 p.p.m. For the fourth test, the roof jack was reinstalled and the pressure regulator was set for "NAT". A test "probe" was inserted down through the roof jack to where the combustion gases exit the furnace. The result of that test was 10 p.p.m.

During the first three tests, Dudden and Winters had trouble keeping the furnace lit, and they had to relight the pilot a number of times. Also, during the third test, (the LP setting) the experts testified the furnace emitted noxious fumes, causing irritation and watering of their eyes and noses, and causing an offensive odor.

Several witnesses testified that when the furnace burns on natural gas (as is the case herein), if the pressure regulator is set for "NAT", the gas burns very efficiently (resulting in a blue flame) and produces very little uncombusted materials (carbon monoxide is partially uncombusted as is soot). However, if a natural gas furnace is set for "LP", the gas burns inefficiently (resulting in a yellow flame) and produces substantially greater amounts of uncombusted materials. Furthermore, these witnesses explained, consistent with the de-

sign of the furnace, if the combustion materials are not allowed to escape through (e.g.) a roof jack, they will recirculate inside the combustion chamber and eventually (within minutes) extinguish the burner flame and with it, the pilot light. However, witnesses for appellant testified that the furnace would indeed run, at least for a complete cycle.

The case was submitted to the jury on the theory of strict liability, however, the testimony of Dr. Garriott was excluded as was any evidence of his positive test results. Respondents' Motions for Directed Verdicts were overruled. After deliberation, the jury returned verdicts in favor of respondents on both counts. Following the overruling of timely-filed post-trial motions, appellant filed her notice of appeal. Respondents moved to dismiss the appeal and said motions have been overruled by this court.

■ Appellant's first point charges that the trial court erred in overruling her objections to respondents admitting the testimony of Drs. Johnson and Lacefield, toxicologists. Appellant's argument may be summarized as follows: (a) Drs. Johnson and Lacefield were appellant's expert witnesses retained by her in anticipation of litigation; and in allowing respondents to elicit testimony from them, the court violated Rule 56.01(b); and (b) respondents failed to designate Drs. Johnson and Lacefield as expert witnesses that they intended to call at trial; and by allowing their testimony, the court violated its own pre-trial order requiring such designation.

The record discloses that Dr. Johnson was contacted by appellant's pathologist, Dr. Bridgens. Apparently, and there is nothing in the record to suggest otherwise, Dr. Bridgens contacted Dr. Johnson on his own initiative, without informing appellant. Then, Dr. Johnson likewise contacted Dr. Lacefield on his own initiative, without informing appellant or even Dr. Bridgens. So, in essence we have expert witness contacting expert witness contacting expert witness.

Appellant argues that even though Drs. Johnson and Lacefield are once and twice removed, so to speak, they are still expert witnesses within the meaning of Rule 56.-01(b) and as such their identities cannot be discovered.

Appellant's argument is inappropriate. There is no dispute that appellant failed to designate Drs. Johnson and Lacefield as expert witnesses that she intended to call at trial, and the reason is quite obvious. There is also no dispute that respondents discovered the identity of Dr. Johnson through Dr. Bridgens' deposition and subsequently discovered the identity of Dr. Lacefield through Dr. Johnson. However, appellant's argument fails for the reason that Rule 56.01(b) is a rule of discovery. It states:

(4) **Trial Preparation: Experts.** Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this Rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(a) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the general nature of the subject matter on which the expert is expected to testify.

(b) A party may discover by deposition the facts and opinions to which the expert is expected to testify. Unless manifest injustice would result, the court shall require that the party seeking discovery pay the expert a reasonable fee for responding to discovery by deposition.

There is no prohibition to calling an opposing party's expert witness at trial. If the party calling such witness has failed to previously discover through 56.01(b) the facts known by and opinions of such witness, then of course that party runs the risk that he will be bound by unfavorable testimony. In the present case, respondents did, in fact, discover the witnesses' identities as well as facts and opinions through the taking of depositions. The time to object to their testimony was prior to the taking of such depositions. Appel-

lant did not raise any objection to the taking of the depositions or file any motion for protective order to prohibit such. Therefore, she is now precluded from so objecting. *See State ex rel. Mueller v. Dixon,* 456 S.W.2d 594, 596–97 (Mo.App.1970); cf. *State ex rel. Richardson v. Randall,* 660 S.W.2d 699 (Mo. banc 1983) (timely objection made to discovery of non-testifying expert witnesses.)

It is important to note that this court is not deciding the questions of whether Drs. Johnson and Lacefield are appellant's experts, or whether any prediscovery motions to prohibit their discovery would have been proper or successful. This court's ruling is based simply on the fact that Rule 56.01 is a rule of discovery, not a rule of evidence, and, having failed to preserve any objection, appellant is prohibited from raising such objection at trial.

■ Appellant's second argument in her point (1) is that the court erred in allowing respondents to call Drs. Johnson and Lacefield as expert witnesses because said witnesses were not so designated by respondents.

The record establishes that on November 5, 1985, (almost one year before trial) the court signed an order, stating in part:

On October 25, 1985 counsel for the parties and the Court held a pre-trial conference. In accordance with discussions at the pre-trial conference, the Court Orders as follows:

(1) Plaintiff has now named seven expert witnesses. These expert witnesses are the only experts whom Plaintiff may call at trial of this matter.

(2) *Within 90 days of the date of this Order, Defendant shall name all of their expert witnesses.*

(3) Defendant's expert witnesses shall be limited to seven, the same number as Plaintiff's expert witnesses.

(4) Plaintiff shall depose all of Defendant's expert witnesses within 150 days of the date of this Order.

(5) *The aforesaid deadlines to name expert witnesses are absolute, and no further expert witnesses will be named therafter (sic), short of death of said witness.* (Emphasis added)

It is not disputed that respondents failed to designate Drs. Johnson and Lacefield as expert witnesses within the time prescribed by the Order. And it is not disputed that the court allowed the testimony of these previously undesignated witnesses over the objections of appellant. Respondents argue that the testimonies of Drs. Johnson and Lacefield were admissible because they were fact witnesses rather than expert witnesses, and as such it was not required that they be designated prior to trial.

■ Although this court questions the validity of respondents' argument, it is not necessary to decide the question because the examination of a witness whose name has not been disclosed, though requested, is a matter resting within the sound discretion of the trial court. *Dane by Dane v. Cozean,* 636 S.W.2d 87, 90 (Mo.App.1982); *Bethell v. Porter,* 595 S.W.2d 369, 377 (Mo. App.1980); and *Missouri Public Service Co. v. Allied Manufacturers, Inc.,* 574 S.W.2d 509, 511 (Mo.App.1978)[4]. In the present case, appellant knew the identities of these witnesses long before trial, and she also knew of the facts and opinions to which they would testify at trial. Appellant had the opportunity to depose these witnesses. She cannot now claim surprise or inadequate opportunity to discover. Therefore, this court holds that the trial court did not abuse its discretion in allowing Drs. Johnson and Lacefield to testify.[5]

Appellant's point (1) is overruled.

■ Appellant's second point charges that the trial court erred in sustaining re-

---

**4.** The court's Order was no more than a preliminary disposition of the issue, and respondents' request to call the witnesses reactivated the original question for decision by the trial court in exercise of the same discretionary power it exercised in its original order. *See Aulgur v. Zylich,* 390 S.W.2d 553, 557 (Mo.App.1965).

**5.** Appellant raises the question of Dr. Lacefield's qualifications to testify, however, appellant asserts matters which are outside the record and as such this court cannot consider the issue.

spondents' Motion in Limine, thereby excluding the testimony of appellant's toxicological expert, Dr. James Garriott.

As stated *supra*, Dr. Garriott was contacted by Dr. Bridgens after multiple testing of decedent's tissues by Drs. Johnson and Lacefield resulted in "toxicologically insignificant" levels of carbon monoxide. Dr. Garriott first tested the tissues sent to him by Dr. Johnson and, using testing methods and procedures generally accepted as scientifically reliable, obtained negative results.[6] Then Dr. Garriott decided to modify the test. He used the same test method but modified the procedure by expanding the reaction time from two hours (the standard reaction time) to seventy-two hours. Using this modified procedure, Dr. Garriott determined that the tissue sample contained "probably 60 or higher, 60 percent or higher" levels of carbon monoxide. (This estimate varies greatly from those of Drs. Johnson (12%); Winek (below 5%) and Lacefield (9%)).

Appellant concedes that the law in Missouri is that the results of scientific tests are only admissible after a requisite showing that they were conducted in accordance with generally accepted scientific principles. *See Alsbach v. Bader*, 700 S.W.2d 823 (Mo. banc 1985). Appellant argues, however, that the tissue samples in the present case were unusual in nature (in that they had been embalmed) and that there is no generally accepted scientific principle for testing these particular samples [7] and that therefore, Dr. Garriott's testimony should have been admitted and the jury should have been allowed to pass on its credibility. The appropriate standard, adopted by Missouri, is stated in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir. 1923), as follows:

Just when a scientific principle or discovery crosses the line between experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

Dr. Garriott's own testimony establishes that (a) there is no scientific literature which supports his modified test procedure; (b) he had not done any studies to verify the accuracy of his theory upon which he based the modification; (c) the possibility exists that his theory is invalid; and (d) it is not a scientifically valid theory because it has not been proven scientifically and it has not been really performed as a real experiment.

The practical problems involved in admitting this kind of testimony were aptly illustrated by the trial court when it stated:

See, the problem that we have in here, and counsel have convinced me—in fact, you have not led me to believe to the contrary, and frankly, I don't know the first thing about toxicology, but unless you can represent to me that Dr. Garriott's tests were performed on valid scientific principles, I can't let it in under any set of circumstances, whether through cross-examination, through direct examination, or any other way. They're as if—let me finish. They're as if they had never been done in the eyes of the law for the reason that they were not based on scientific principles. Suppose somebody, some crazy person decided to use a carrot and put in slices of

---

**6.** Drs. Johnson, Lacefield, Garriott and Winek all testified that there are three different test methods, all generally accepted as scientifically reliable for testing tissue samples for carbon monoxide, and these are the Conway diffusion, gas chromatography, and spectrophotometic methods. However, not all methods were used by each toxicologist because of the nature of the tissue sample. Dr. Garriott's tests were conducted using the Conway diffusion method.

**7.** Dr. Garriott is the only toxiologist who testified that there is no generally accepted scientific principle for testing these types of samples. On the other hand, respondents' three toxicologists did state that although there are limitations, there are generally accepted scientific principles for testing these samples and that their tests were in conformity with such principles.

carrots into the Conway dish, and he's an insane man and he says, well, I put carrots in there and I waited three to six hours and I found that the carrots turned blue, and that told me that there was carboxyhemoglobin to the extent of 95 percent in the sample given to me. There is no more basis for that kind of silliness than there is for Dr. Garriott's unless you can show me that somebody, either in the literature or some recognized expert says this is the way we do it.

Respondents' Motion in Limine was based upon the argument that Dr. Garriott's testing procedure was not based upon generally accepted scientific principles, and was therefore inadmissible. The court reserved its ruling on the admissibility of Dr. Garriott's testimony, giving appellant the opportunity to establish the necessary foundation at trial. Despite this, appellant never called Dr. Garriott, nor did she attempt to utilize his deposition testimony.

A trial court cannot be convicted of error unless evidence or testimony is offered by a party but refused by the trial court. After such refusal, appellant has the burden of making an offer of proof that demonstrates that relevant and admissible evidence was improperly excluded. *See Linville v. Wilson*, 628 S.W.2d 422, 425 (Mo.App.1982); and *Stapleton v. Griewe*, 602 S.W.2d 810, 813 (Mo.App.1980). This court does not find, and appellant fails to point to where any such offer of proof has been made.

The transcript of the deposition testimony of Dr. Garriott has been filed by appellant as an exhibit in this case, however, this belated offer of proof is insufficient to convict the trial court of error. *See Williamson v. Epperson*, 529 S.W.2d 25, 29 (Mo.App.1975).

■ Appellant argues, alternatively, that the testimony of Dr. Garriott was erroneously excluded because defense counsel "opened the door" to admit such testimony when he introduced into evidence a letter written by Dr. Bridgens to Dr. Johnson requesting that Dr. Johnson send the tissue samples to Dr. Garriott for testing.

The curative admissibility doctrine permits a party to reply to inadmissible evidence introduced by the opposing party with similar evidence if the introduction of such evidence will remove an unfair prejudice brought about by the admission of the earlier inadmissible evidence. *Elliott v. Mid–Century Insurance Co.*, 701 S.W.2d 462, 466 (Mo.App.1985).

Although appellant argues that this letter was prejudicial, she does not state how it was prejudicial. This court surmises that appellant believes that the jury was allowed to assume that if the tissue samples were sent to Dr. Garriott and there was no evidence of his test results, then those results must have been prejudicial to appellant (i.e., toxicologically insignificant levels of carbon monoxide). However, this is pure speculation by appellant. There was no evidence that Dr. Johnson, in fact, sent the tissue samples to Dr. Garriott, or that Dr. Garriott received them, or that Dr. Garriott tested them. It is just as reasonable to speculate that the jury inferred that Dr. Johnson either did not send the samples, or that Dr. Garriott did not receive or test them. The admission of curative evidence is within the sound discretion of the trial court. *Gevermuehle v. Geimer*, 619 S.W.2d 320, 322 (Mo.App.1981). This court holds that there was no such abuse of discretion. Appellant's point (2) is overruled.

Appellant's point (3) charges that the trial court erred in overruling appellant's objections to respondents' engineering experts' testimonies concerning the results of carbon monoxide testing performed in the mobile home because there was not adequate and proper foundation for such tests. Appellant's argument may be summarized as follows:

Decedent died on November 5, 1984. Respondents' engineering experts tested the furnace for carbon monoxide production in February, 1986. In the interim, the pressure regulator had been changed from "NAT" to "LP". A roof jack had been installed, the mobile home had been sold by

appellant to a Doris Martin in the spring of 1985, and Ms. Martin in turn sold the home to respondent Fuqua's insurer in the fall of 1985. Appellant argues that respondent failed to establish that the mobile home, when tested in February of 1986, was in the same or similar condition, in material aspects, as it was on November 5, 1984. Appellant's argument is without merit.

The foundation for the admission of experimental tests requires a showing that the test, in material aspects, has the requisite similarity to the conditions or occurrences at issue in the suit. However, substantial similarity is a flexible concept, depending upon what conditions are important to control. *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 954 (Mo.App.1985). Furthermore, the admissibility of experimental evidence is within the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal absent a clear showing of abuse of discretion. *Klein v. General Electric Co.*, 714 S.W.2d 896, 904 (Mo.App.1986).

In the present case, Mel Winters, Milo Dudden and Jordan Heiman (engineering experts) tested the home and furnace, on behalf of respondents, in February, 1986. Mel Winters, retired employee of the manufacturer of the furnace, inspected the furnace and testified that it was substantially similar in all essential details as it was when it was first sold by the manufacturer. Furthermore, Winters examined photographs of the furnace, taken by appellant's experts on November 16, 1984, and testified that the furnace was substantially similar in all essential details as it was in November of 1984. Dudden also examined the photographs and, comparing them to the furnace, was able to state that the furnace was substantially similar in all essential details as it was in November of 1984.

Moreover, Dudden testified that, in preparation for the tests, the roof jack was removed and the hole taped over with duct tape, crisscrossing the tape several times to assure a "tight closure" and a "full seal", as was the condition of the roof and hole in November of 1984.

Appellant's argument that respondents' foundation fails because they failed to call Ms. Martin to establish that no changes were made on the furnace or the heating system does not correctly state the law in Missouri. It matters not that changes are made to the product so long as when the product is tested, it is in substantially similar condition as it was during the time at issue. There is no dispute that a roof jack was installed by appellant and of course that constitutes a major change in the heating system. However, Dudden testified that the roof jack was removed and the hole completely closed, so that the furnace was returned to its condition as of November, 1984.

Appellant's argument that respondents' foundation fails because there was no evidence that the barometric pressure, temperature, wind speed and direction, and weather conditions were substantially similar is absurd. Appellant did not raise these issues at trial and does not establish that these conditions are of any consequence in testing the furnace.

Appellant's point (3) is overruled.

For her point (4), appellant argues that the trial court erred in refusing to allow appellant's witnesses, Sims (engineering expert) and Beach (representative of respondent Fuqua) to testify about their knowledge of the existence and application of federal regulations regarding the manufacture of mobile homes. Appellant argues that such evidence is admissible to establish negligence and gross negligence, and that the court's refusal to admit said testimony forced appellant to submit the case under a strict liability theory rather than negligence. Furthermore, appellant argues that such evidence is admissible to establish aggravating circumstances.

The court took judicial notice of the federal regulations but refused to allow appellant to question the witnesses about it. The court's ruling was correct. Neither witness was qualified to testify to the existence or application of the law. *See City of St. Louis v. Kisling*, 318 S.W.2d 221, 225

(Mo.1958), and *Gardine v. Cottey*, 360 Mo. 681, 230 S.W.2d 731, 745 (banc 1950).

■ Furthermore, since appellant never submitted a negligence per se verdict director, she abandoned the issue and any claim of prejudicial error based on that issue. *See Mullen v. Lowden*, 344 Mo. 40, 124 S.W.2d 1152, 1153 (1939); and *Keller v. International Harvester Corp.*, 648 S.W.2d 584, 590 (Mo.App.1983).

Appellant's point (4) is overruled.

Appellant's point (5) charges that the trial court erred in sustaining respondents' objection to evidence of prior incidents where respondent Fuqua's quality assurance manager, Dave Adair, allowed mobile homes to come off the production line without roof jacks; and evidence of a written reprimand issued to Adair one month prior to the manufacture of the mobile home in question.

Appellant admits that this evidence is relevant only to the issue of damages. As such, the alleged error, in light of the verdict for respondents, is harmless. *Beesley v. Howe*, 478 S.W.2d 649, 653 (Mo.1972); and *Sheili v. Hagan*, 578 S.W.2d 300 (Mo.App.1979).

Appellant's point (5) is overruled.

■ For point (6), appellant charges that the trial court erred in sustaining respondents' objection to the admission of an amended death certificate. The original death certificate for decedent stated the cause of death as "cardio pulmonary arrest, ischemic heart disease." A certified copy of the original death certificate was offered by respondents and the court received it in evidence. At the conclusion of appellant's rebuttal evidence, appellant offered a certified copy of an amended death certificate for decedent. The amended version shows the words "cardio pulmonary arrest" and "ischemic heart disease" have been obliterated by typing over them and immediately next that has been typed "carbon monoxide poisoning." In addition, that portion of the certificate entitled "other significant conditions" the words "None

known" have been typed over and the words "accident", "11/5/84", "defective furnace venting" have been added. Off to the side of the document is typed "amended items 26b–26b–(sic) 27–29a–29b–29c–29d by affidavit for medical examiner 10/15/85."

A bench conference ensued over the introduction of this exhibit. The trial court voiced its suspicion of the amended document because it had clearly been altered on its face.[8]

Upon suggestion of the trial court, the parties agreed that the offer of the amended certificate would be withdrawn as would the introduction of the original certificate. The jury was instructed that the evidence of death certificates was withdrawn and that it (the jury) was not to consider them in its deliberations.

The record clearly reveals that appellant agreed to this disposition, and she requested no further relief. In so doing, appellant abandoned her offer of the document. A party may not complain of alleged error in which, by his own conduct at trial, he joined or acquiesced. *See Reece v. Missouri Delta Bank*, 710 S.W.2d 21, 23–24 (Mo.App.1986); and *Benjamin v. Benjamin*, 370 S.W.2d 639, 643 (Mo.App.1963);

Appellant's point (6) is overruled.

■ Finally, appellant argues for her point (7) that the trial court erred in failing to admonish respondent Fuqua's counsel for making inflammatory, prejudicial and improper remarks in the presence and hearing of the jury.

Appellant alleges that on the final day of trial, counsel for appellant, Barry McCormick, briefly left the courtroom to secure his next witness. According to appellant, while Barry was gone, counsel for respondent Fuqua, Evan Douthit, stared directly at the jury and said, in a voice loud enough to be heard by the jury, that appellant's counsel had gone out to "tell his next witness what to say." Appellant's co-counsel, Mike McCormick, who was seated directly

8. Upon inquiry to the Department of Health, Division of Health Resources, this court has determined that the amended version is properly on file in that department.

across the counsel table from Mr. Douthit, admonished Douthit for the remark, to which Douthit replied that he "could do anything [he] want[ed]." Whereupon, Mr. Douthit, in somewhat quieter tones, attempted to continue his comments directly to the jury.[9]  Mike McCormick then asked if counsel could approach the bench where the following occurred on the record:

MR. MICHAEL McCORMICK: Your Honor, when Barry left the room—

THE COURT: Keep your voice down.

MR. MICHAEL McCORMICK: When Mr. McCormick left the room to go get the next witness, Mr. Douthit, I would like the record to show, made a statement loud enough for the witness and for the jury to hear that he was going out in the hallway to tell his witness what to say, words to that effect.  Then a couple minutes later after I admonished Mr.— or tried to admonish Mr. Douthit for that, he started mumbling something unintelligible towards the jury, looked directly at them.

THE COURT: So what do you want me to do?

MR. MICHAEL McCORMICK: I want the record to show that, and I think it's improper, and I think he should be admonished for it.

MR. DOUTHIT: Let the record reflect that the comment was directed to Mr. McCormick in response to these statements.

THE COURT: All right.  Let's go.

(The proceedings returned to open court.)

Respondent's counsel, of course, relates a somewhat different version of the event.

This court has read almost 2,000 pages of trial transcript wherein it is quite evident that this lengthy trial was highlighted by hot tempers, bickering and pointing fingers on the part of both parties' counsel. In fact, in its brief, respondent Fuqua accuses appellant's counsel of "eavesdropping" on conversations between respondents' counsel.

This court refuses to be referee in this wrestling match.  There is nothing in the record for this court to review.  There is no

evidence that the jury heard the alleged remarks.  This court defers to the wisdom of the trial court, which was present during the melee, and if that court did not feel that an admonition was in order then there was no error in failing to administer one.

Appellant's point (7) is overruled.

Judgment affirmed.

All concur.

---

9.  This court notes that the foregoing event is not a part of the record.